Chad C Shattuck, #9345
B. Ray Zoll, #3607
Tycksen & Shattuck, L.C.
12401 South 450 East, Suite E-1
Draper, Utah 84020
Telephone: (801) 748-4081
Fax: (801) 748-4087
Email: chad@tyshlaw.com
Email: rayzoll@hotmail.com
*Attorneys for Plaintiffs*

---

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STAN SHELLEY and ANDREA LEE SHELLEY, as individuals,<br><br>Plaintiffs,<br><br>v.<br><br>RANDY REDD, an individual, MARYLYNN N. REDD, an individual, DAKOTA REDD, an individual, KEVIN CLARK, an individual, LPL Financial, LLC, a California corporation, and Cazut Properties, LLC, an Arizona Limited Liability Company,<br><br>Defendants. | **COMPLAINT**<br><br>(JURY TRIAL DEMANDED)<br><br>Case No.<br>Judge |

**COME NOW**, Plaintiffs Stan Shelley and Andrea Lee Shelley (hereinafter "Stan," "Andrea," or "Shelleys" collectively) through its counsel TYCKSEN AND SHATTUCK, L.C., and Pursuant to Rule 8(a) of the Federal Rules of Civil Procedure submit their Complaint against Defendants Randy Redd ("Randy"), MaryLynn Redd ("MaryLynn"), Dakota Redd ("Dakota"), Kevin Clark ("Kevin"), LPL Financial, LLC ("LPL"), and Cazut Properties, LLC ("Cazut"), as set forth below.

## PARTIES

1.      The Shelleys are individuals residing in Draper, Utah and acted together in funding this project and venture from their collective funds.

2.      Randy is an individual residing in Queens Creek, Arizona.

3.      MaryLynn is Randy's wife and an individual residing in Queens Creek, Arizona.

4.      Dakota is Randy's son and an individual residing in San Tan Valley, Arizona.

5.      Kevin is an individual residing in Chandler, Arizona.

6.      LPL is an LLC headquartered in San Diego, California.

7.      Cazut is a Limited Liability Company headquartered in Gilbert, Arizona.

## JURISDICTION AND VENUE

8.      This action arises out of a violation of certain Utah laws and violations of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a et. seq. This Court has original subject matter jurisdiction over Exchange Act claims pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C § 78aa. This Court has ancillary jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 in that said claims are joined with substantially related claims arising from the same set of facts under the Securities Act.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the Shelleys' claim exceeds $75,000.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties. Plaintiffs are individuals domiciled in Utah, Defendants, Randy and MaryLynn, Dakota and Kevin are individuals domiciled in Arizona. LPL is an LLC domiciled in California. Cazut Properties is an LLC domiciled in Arizona.

11.     This Court has personal jurisdiction over Randy because Randy has sufficient minimum contacts with the state of Utah, including because Randy solicited the Shelleys and entered into an agreement with the Shelleys in this District. This Court also has personal jurisdiction over Kevin, Dakota, and MaryLynn because they have sufficient minimum contacts with the state of Utah, including because they entered into an agreement with the Shelleys in this District. This Court has personal jurisdiction over LPL because Randy, as an agent of LPL, did solicit the Shelleys in Utah and did violate laws in Utah. LPL, through its agent Randy, has responsibility for Randy's misconduct. This Court has personal jurisdiction over Cazut because it has sufficient minimum contacts within the state of Utah, including because it entered into an agreement with the Shelleys in this District verbally and in the form of a written operating agreement.

12.     Venue is proper under 28 U.S.C. § 1391 for the same reasons outlined above and all Defendants anticipated being subject to jurisdiction in the state of Utah because they were soliciting and contracting with Utah residents.

## GENERAL ALLEGATIONS

### A.     The Deal

13.     In May of 2023, Randy reached out to Stan and proposed the purchasing of a property consisting of 680 acres with 230 KV power lines necessary to develop a solar farm and the proposition of splitting the profits of the venture with the Shelleys equally as 50/50 investing partners. The purchase of land and building for said solar farm would cost $4,400 per acre. The Parties would flip the property to Randy's inside connection with NEXTERA SOLAR FARMS, who is a substantial and well-known established organization in the solar power industry. The Shelleys verbally accepted Randy's proposal (hereinafter "the Deal").

14.     Randy represented to the Shelleys that the purchase price was just over $3 million and that Randy would tie up the property by putting down $50,000 with a 90-day agreement to purchase the 680 acres of land at $4,400 per acre.

15.     Randy represented to the Shelleys that it would cost the Shelleys $1,500,000 as their 50% of the investment to purchase this land under this opportunity.

16.     The Shelleys agreed to Randy's offer to invest in his venture, believing that Randy was being truthful and relying on his representations about the equal investment by the Redds and the Shelleys.

17.     Randy represented top the Shelleys that the land could be "flipped" to NextEra Solar Farms for $12,000,000.  Randy represented that he knew of a prior purchase by NextEra for land that was located in Florence Arizona at $23,000 per acre because Randy's in-laws, the Nevitt family, had participated in a similar deal previously.

18.     During subsequent calls between the Shelleys and Randy regarding the Deal, Randy began making slight changes to the offer, even after the Deal had been accepted, and represented to the Shelleys that he promised to family members that they could be part of the Deal.

19.     The Shelleys said they would consider allowing Randy to bring family members into the Deal for equivalent proportionality and control and investing subject to a supplemental amending of the Deal in writing based on the representations of Randy.

20.     As such, Dakota allegedly contributed $350,000 to the Deal, and Shelleys were to be then reduced to a 45 percent interest in the net profits and investment.

21.     Randy wanted an LLC to be set up with his wife MaryLynn's name to be shown as the President. The Shelleys consented to having MaryLynn given the title of President, although Shelley now understands there is no such title in an LLC.

22.     Randy informed the Shelleys that Kevin was also to be part of the Deal. The Shelleys approved because they knew Kevin, and he had worked with the Shelleys on business ventures that were successful in the past, and they trusted him.

23.     On or about July 14, 2023, Kevin sent the wire information for each of the investors to send funds as set forth on a Schedule A (attached hereto as Exhibit 1), for the total of $3,350,000, to be paid collectively by all parties to the deal. This included over $350,000 in working capital.

24.     Defendants provided the Shelleys a no risk venture, with no subscription agreements, no disclosures of any kind except that this was a very profitable venture based on the efforts contacts and experience of Randy and the concerted Defendants efforts consistent with the corroboration by Randy, MaryLynn, Kevin, and Dakota.

25.     Randy and Kevin then used Cazut[1] as an entity to carry out the Deal to be the holding company for the venture. Kevin was to act as manager and MaryLynn was to act as the assistant manager.

26.     The members were to be as described in Schedule A (Exhibit 1).

27.     No formal meetings were held, no written consents provided as required in the operating agreement that was unilaterally imposed upon the Shelleys by Defendants.

28.     The Shelleys wired $1,507,500 to Kevin as per the wire instructions on Schedule A (Exhibit 1).

---

[1] Cazut had been created on December 17, 2009 for other purposes.

29.     Kevin told the Shelleys he would correct the ownership information to the LLC instead of the individuals who signed the operating agreement once the Deal closed. The Shelleys relied on this representation.

30.     Since Randy represented that time was of the essence to make the Deal happen, Kevin utilized the Cazut entity and also used Andrea's social security number as necessary information related to his duties in the Deal.

31.     The 680 acre property (comprised of several parcels) was purchased by Cazut on or about August 1, 2023.

**B.     The Subsequent Meetings**

32.     From August to September 2023, the Shelleys reached out to Kevin several times to correct the LLC information and obtain an accounting and transparent disclosures of the Deal and its status.

33.     Kevin continually stated that he was too busy to meet.

34.     Stan was finally able to call a meeting  on November 3, 2023.

35.     At the November 2023 meeting, the Deal reached appeared to be changing into something far different than what the Shelleys agreed to. It began to look substantially different and the proposition was not as sure to be a simple 'flip' nor as profitable as Randy led the Shelleys to believe, and the parties had the need to procure a new prospective buyer to "flip" the property, which was a major shock to the Shelleys, because Randy had led them to believe that such was already in place.

36. During the October 2023 meeting Stan, Randy, and Kevin discussed the need to contact other Solar builders and providers. Randy had after the fact tasked Stan to get quotes and

processes necessary for changing the zoning of the property so it could be used in the Deal, which Stan accomplished and presented with a proposed cost in excess of $50,000.

37.     Stan was tasked to review an issue regarding taxes and the acreage of the parcels of property to deal with a discrepancy that Kevin had not initially located regarding a possible shortfall in the acreage needed for the Deal.

38.     Randy proposed the idea of putting a solar pump on the property at a cost of $25,000. Stan asked if they were going to improve the property if they did not have to replace the large pump. Much to Stan's surprise, Kevin and Randy stated that they did not have the money in working capital.

39.     As of the October 2023 meeting, no accounting had yet been provided to the Shelleys.

40.     Kevin and Randy's assertion that there was insufficient working capital in October 2023 raised concern for the Shelleys because based on Randy's prior representations, they should have had over $350,000 left in the account at that time.

41.     Randy stated that there was just over $50,000 left in the account at the time of the October 2023 meeting.

42.     Kevin then told the Shelleys that he would finally provide an accounting.

**C.     After the Meeting**

43.     Shortly after the meeting, the Shelleys found the additional 40 acres needed for the Deal, however, the Shelleys noticed in the county records that the purchase for the initial acreage was only $1,985,300 and not $3,000,000, as the Shelleys were told by Defendants.

44.     The Shelleys suspected this was an error and asked Randy and Kevin for an explanation when they spoke on November 3, 2023

45.     During a call on November 6, 2023, Randy acknowledged the lie about the purchase price of the property and stated that the $1,985,300 was in fact what they paid for the land and that they had lied to the Shelleys when pitching the Deal.

46.     Randy stated that Kevin was supposed to inform the Shelleys that the Shelleys' cost was higher than Defendants' and that it was fair to charge the Shelleys an extra 25 percent equity share for Defendants' work. That was never part of the Deal.

47.     The Shelleys also stated that, even if true, charging the extra 25 percent was not acceptable because it was not part of the Deal and additionally that the math was wrong because the discrepancies did not add up to 25 percent. At this point it became clear to the Shelleys that they were victims of a fraud perpetuated by the Defendants.

48.     In what appeared to be an effort to ratify their fraud, misrepresentations, and failures to disclose, Randy quickly offered to sell the rest of the property to the Shelleys for the price they already paid to obtain it.

49.     Randy further wanted the Shelleys to promise that the Shelleys would not inform anyone of the fraud and misrepresentations and asked that the Shelleys would hold Defendants harmless and release any claims against them.

50.     The Shelleys did not agree to hide Defendants' deceit because Defendants had stolen from them, lied to them, betrayed their trust, and made numerous misrepresentations and nondisclosures.

51.     The Shelleys thereafter called Kevin multiple times, but got no response. Subsequently the Shelleys emailed Kevin pointing out that Kevin and his group had effectively embezzled $1,364,700.

52.     Thereafter Kevin, Randy, and MaryLynn continued to evade the Shelleys' repeated attempts to contact them about the fraud and embezzlement.

53.     Randy eventually called the Shelleys on November 7, 2023, with his proposed solution, and stated that he wanted to sell the all of the land for $477,800 (being the difference between what the Shelleys paid and the actual purchase price of the land) to the Shelleys because he wanted to get out of the Deal.

54.     Kevin sent the Shelleys a proposed Purchase Agreement for them to acquire all of the land in the Deal.

55.     The Shelleys contacted Randy and Kevin's lawyer, Jeff Sellers (hereinafter "Sellers"), and they sought resolution, but the negotiations failed. Sellers was also conflicted because he had previously been the attorney for the Shelleys and now represented only Defendants against the Shelleys.

56.     Randy later denied ever working on the Deal with the Shelleys and would only refer the Shelleys to Kevin for further communication.

57.     The Shelleys were finally provided an accounting showing that the investors had paid a purported total of $2,038,889. This was much less than the $3,350,000 that was represented and agreed upon between the parties.

58.     All Defendants went silent thereafter, refusing to communicate regarding the matter, forcing the Shelleys to file this legal action as their only viable option for recourse.

**<u>FIRST CAUSE OF ACTION</u>**
**Violations of § 10 of the Exchange Act and 10b-5**
**(Against Randy, MaryLynn, Dakota, and Kevin)**

59.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

60.     This Count is asserted against Randy, Kevin, MaryLynn and Dakota and is based upon section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

61.     Randy, Kevin, MaryLynn and Dakota violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- Employed devices, schemes and artifices to defraud the Shelleys;

- Made untrue statements of material facts or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- Engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Shelleys.

62.     Randy, Kevin, MaryLynn and Dakota acting as aiders, abettors, and promoters, disseminated or approved the following false misleading statements and omissions, which Randy, Kevin MaryLynn, and Dakota either knew or deliberately disregarded:

(a) That the Deal was legitimately purposed to buy land at the contributions agreed upon to flip the property to a third party to create a solar farm and was expected to generate profits of $9,000,000 and would be profitable in the future as a solar farm. In fact, the Deal was not yet suited for this purpose when proposed, and had great risks associated with delays and other matters (such as zoning and the need for additional land) that amounted to fraud and the representations were designed to induce Shelley into making this investment;

(b) The Defendants failed to disclose the risks to the Shelleys;

10

(c) Defendants effectively embezzled funds to their benefit and took larger than contributed membership interests and money.

63.     Randy and Kevin acted with scienter in that they knew the representations made to the Shelleys were false, misleading, and contained material and significant omissions. Despite knowing that the statements made to the Shelleys were false and misleading, Randy, Kevin, MaryLynn, and Dakota made such statements and omissions in concert because they knew or should have known the property was not of the specifications agreed upon or contemplated.

64.     The Shelleys relied to their detriment on the false and misleading statements by Randy, Kevin, MaryLynn, and Dakota in deciding to invest in the property and participate in the Deal.

65.     As a proximate result of Randy, Kevin, MaryLynn, and Dakota's fraud and deceit and the facts alleged herein, the Shelleys were injured in the amount not less than $1,364,700, representing the difference between the value paid by the Shelleys for their investment in the property and the actual value of the property.

## SECOND CAUSE OF ACTION
### Violation of § 20 of the Exchange Act
### (Against Randy, Kevin, MaryLynn, and Dakota)

66.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

67.     As set forth above, Randy, Kevin, MaryLynn and Dakota violated federal securities laws in connection with their solicitation of the Shelleys' money.

68.     Randy, Kevin, MaryLynn and Dakota acted as controlling persons of Cazut within the meaning of §20(a) of the Exchange Act. As founding members, managing members, and agents of Cazut, they exercised actual power and control over the Shelleys and Cazut. Randy,

Kevin, MaryLynn and Dakota held a majority interest and controlled the decisions of Cazut and used the same to control the Deal with ultra vires acts.

69.     Additionally, because of their position of, control, and authority, Randy, Kevin, MaryLynn and Dakota were able to, and did, control the information that Cazut disseminated to the Shelleys. Simply put, by virtue of their position with Cazut, Randy, Kevin, MaryLynn and Dakota had the power and authority to cause Cazut to engage in the wrongful conduct complained of herein. Notwithstanding Cazut should be treated as a fiction and not a valid legal entity for this Deal because of the fraud in the inducement described herein.

70.     By reason of the above conduct, Randy, Kevin, MaryLynn and Dakota are liable pursuant to Section 20(a) of the Exchange Act for the violations committed against the Shelleys.

### THIRD CAUSE OF ACTION
**Violation of the Utah Uniform Securities Act § 61-1-1, et. seq.**
**(Against Randy, Kevin, MaryLynn, and Dakota)**

71.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

72.     The Shelleys' interest in Cazut, and the alter ego partnership venture, constitute a "security" as defined by the Utah Uniform Securities Act § 61-1-13.

73.     As set forth above, Randy, Kevin, MaryLynn and Dakota sold a security to the Shelleys by making written and oral communications which included untrue statements of material fact and/or omitted material facts necessary in or to make the statements communicated, in light of the circumstances under which they were made, not misleading.

74.     Randy, Kevin, MaryLynn and Dakota's false statements and omissions were made with the intent to induce the Shelleys to invest in the enterprise for an interest in Cazut or the venture.

75.     As a proximate result of Randy, Kevin, MaryLynn and Dakota's conduct, the Shelleys are entitled to rescind the transactions wherein they invested in Cazut and the Deal and be awarded their investment, with interest, attorney's fees and punitive damages/sanctions as available under the Act.

### FOURTH CAUSE OF ACTION
**Fraud/Misrepresentation**
**(Against Randy, Kevin, MaryLynn, and Dakota)**

76.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

77.     As further described herein, in connection with their attempts to get the Shelleys to invest a significant amount of money in Cazut and their enterprise, Randy, Kevin, MaryLynn and Dakota failed to disclose material information regarding the land and the company involved in the Deal. In addition, they all made significant misrepresentations, including but not limited to the financial status of the company and enterprise.

78.     Randy MaryLynn, Dakota, and Kevin knew the statements made to the Shelleys were false. Moreover, the Defendants knew that they failed to disclose material information about the Deal to purchase property to the Shelleys.

79.     The Defendants made the representations and concealments stated hereinabove with the intention to deceive and induce the Shelleys to act in reliance on these representations and invest in Cazut and their enterprise.

80.      At the time these representations were made by the Defendants, and at the time the Shelleys made the investments in Cazut and the enterprise, the Shelleys were ignorant of the falsity of the representations and believed them to be true. In reliance on Randy, Kevin, Dakota and MaryLynn's representations the Shelleys were induced to and did invest in Cazut and the

13

enterprise. Had the Shelleys known the actual facts, they would not have entered into the Deal and would not have even been involved.

81.     The Shelleys were justified in relying on the Defendants' representations because Randy was one of the Shelleys financial advisors and Randy had worked hard to obtain their trust and confidence. Moreover, Randy and Kevin controlled Cazut and the enterprise's finances as well as the communications between Cazut and the enterprise and its investors, including the Shelleys. As a result, the Shelleys had little choice but to rely upon the representations they received about Cazut and the enterprise.

82.     As a proximate result of the Defendants' fraud and deceit and the facts alleged herein, the Shelleys were damaged in an amount not less than $1,364,700, representing the difference between the value paid by the Shelleys for their investment in the property and the actual value of the property.

83.     The Defendants' aforementioned actions were done willfully, intentionally, maliciously, and with an express intent to harm the Shelleys. As a result, the Shelleys request that punitive damages be assessed against Randy, Kevin, MaryLynn, and Dakota.

## FIFTH CAUSE OF ACTION
### Aiding and Abetting Fraud
### (Against MaryLynn and Dakota)

84.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

85.     MaryLynn and Dakota knew that Randy and Kevin were soliciting the Shelleys to invest in Cazut or the enterprise.

86.     MaryLynn and Dakota knew that Randy and Kevin were making false and misleading statements, as well as material omissions, in Randy and Kevin's solicitation of the Shelleys.

87.     MaryLynn and Dakota gave substantial assistance and/or encouragement to Randy and Kevin in connection with the false and misleading statements, as well as material omissions, made to the Shelleys.

88.     As a direct and proximate cause of MaryLynn and Dakota's actions, the Shelleys have been damaged in an amount to be determined at trial, but not less than $1,364,700 and $1,507,500 as their investment.

89.     MaryLynn and Dakota's aforementioned actions were done willfully, intentionally, maliciously and with an express intent to harm the Shelleys. As a result, the Shelleys request that punitive damages be assessed against MaryLynn and Dakota.

### SIXTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(Against Randy, Kevin, and MaryLynn)**

90.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

91.     Cazut was and is a manager managed LLC.

92.     Kevin was the named manager of Cazut and MaryLynn was an assistant manager.

93.      As managers and assistant managers, Kevin and MaryLynn owed the members of Cazut, including the Shelleys, a fiduciary duty of loyalty and a duty of care. These duties include, but are not necessarily limited to, Kevin and MaryLynn's obligations to make full and truthful disclosures about the financial health of Cazut and the enterprise, to properly manage the assets of Cazut and the enterprise, to provide full and complete financial records to its investors

15

upon their request, including the Shelleys, and to refrain from using any property, profit, and/or funds of Cazut and the enterprise for their sole interest.

94.     Randy has a fiduciary duty owed to the Shelleys as well by virtue of being a licensed agent of LPL. He owed the same duties of candor and disclosure to make full and truthful disclosures about the financial health of Cazut and the enterprise, to properly disclose the actual the assets of Cazut and the enterprise, to provide full disclosure of all relevant facts pertinent to the deal, and to refrain from using any property, profit, and/or funds of Cazut and the enterprise for his sole interest or benefit.

95.     As alleged hereinabove, Randy, Kevin, and MaryLynn have violated their fiduciary duties of loyalty and care to the Shelleys by, among other things, misrepresenting the financial health of Cazut and the enterprise as well as the purpose and intentions of the business, failing to properly manage Cazut and the enterprise's assets, failing to provide the Shelleys with the true and complete facts relating to Cazut and the enterprise, failing to provide them with the financial records upon request, and using Cazut and the enterprise's funds for their own personal use.

96.     As a direct and proximate cause of Randy, Kevin, and MaryLynn's actions, the Shelleys have been damaged in an amount to be determined at trial, but not less than $1,364,700 and $1,507,500 of investment.

97.     Randy, Kevin, and MaryLynn's aforementioned actions were done willfully, intentionally, maliciously, and with an express intent to harm the Shelleys. As a result, the Shelleys request that punitive damages be assessed against Randy, Kevin, and MaryLynn.

**SEVENTH CAUSE OF ACTION**
**Fraud in the Inducement**
**(Against Randy, Kevin, MaryLynn, and Dakota)**

98.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

99.     As alleged herein, to induce the Shelleys to enter into the Deal, Randy, Kevin, MaryLynn, and Dakota lied and misrepresented to the Shelleys that, among other things, that there were no violations affecting the subject Property and that each had made certain financial contributions.

100.    At the time Randy, Kevin, MaryLynn, and Dakota made these false representations to the Shelleys, Randy, Kevin, MaryLynn, and Dakota knew them to be false; indeed, Defendants made these false representations to the Shelleys solely to defraud the Shelleys and lure them into entering into the Deal and transferring their investment of $1,507,500 to a Cazut account.

101.    The Shelleys reasonably relied upon Randy, Kevin, MaryLynn, and Dakota's knowing misrepresentations in agreeing to enter into the Deal and transfer their investment to Cazut. Indeed, the Randy, Kevin, MaryLynn, and Dakota took affirmative steps thereafter to deceive the Shelleys into believing that there were no violations affecting the property, including by failing to provide a timely accounting and failing to disclose their lies regarding their respective contributions.

102.    Had the Shelleys known that Randy, Kevin, MaryLynn, and Dakota's representations were false or fraudulent, the Shelleys never would have agreed to enter into the Deal, nor would the Shelleys have agreed to transfer their cash investment to Cazut or the venture to fund the Deal.

103.    As a result of Randy, Kevin, MaryLynn, and Dakota's knowingly false and fraudulent misrepresentations and the Shelleys' reliance thereupon, the Shelleys have suffered damages.

104.    By reason of the foregoing, the Shelleys have been injured in an amount to be determined at trial but not less than $1,364,700 plus their investment of $1,507,500, plus interest, for which sum Randy, Kevin, MaryLynn, and Dakota are liable to the Shelleys.

## EIGHTH CAUSE OF ACTION
### Declaratory Relief
### (Against Randy, Kevin, MaryLynn, Dakota, and Cazut)

105.    The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

106.    For the Court to declare that Cazut is a null and void and fictitious company in regard to this lawsuit and is otherwise deemed null and void regarding its operating agreement and all of its provisions as against the Shelleys. Hence any provisions regarding venue and arbitration for disputes between the parties is not applicable and void AB INITIO as a matter of law due to the fraud in the inducement and misrepresentations as well as failing to disclose the risks of the investment coupled with noncompliance of its own governing provisions.

107.    As alleged hereinabove, because of Randy, Kevin, MaryLynn, and Dakota's numerous false and fraudulent representations in the Deal, the operating agreement is void as to the Shelleys, and the investment must be returned to the Shelleys along with is damages.

108.    Upon information and belief, Randy, Kevin, MaryLynn, and Dakota failed and refused to return the investment, claiming they are entitled to retain the ill-gotten gains.

109.    As such, a justiciable controversy exists between the Shelleys and Randy, Kevin, MaryLynn, and Dakota regarding whether the Shelleys' termination of the Deal was proper and whether they are entitled to the return of the investment and damages.

110.     As alleged hereinabove, because of Randy, Kevin, MaryLynn, and Dakota's numerous breaches of the Deal (including the failure and refusal to furnish the Shelleys with certain information and documents), the transaction's due diligence period was and remains tolled and extended. Upon information and belief, Randy, Kevin, MaryLynn, and Dakota believe that the transaction's due diligence period has closed.

111.     As to these questions, the Shelleys have no adequate remedy at law if necessary to bring forth injunctive relief.

112.     By reason of the foregoing, the Shelleys are entitled to a declaratory judgment that: (i) they cancelled the operating contract effectively, and that they are entitled to the return of their investment plus damages; and (ii) the transaction's due diligence period was and remains tolled and extended, through the present and (iii) that the operating agreement is not applicable against the Shelleys regarding venue and arbitration and otherwise.

## NINTH CAUSE OF ACTION
### Violation of § 17(a) of the Exchange Act
### (Against LPL)

113.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

114.     LPL directly or indirectly with scienter through its agent to wit: Randy Redd, made an offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails have employed, are employing, or are about to employ devices, schemes, or artifices to defraud.

115.     By reason of the foregoing LPL has violated and are violating Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

116.     LPL directly or indirectly in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails through its agent to wit: Randy Redd:

(a)  have obtained, are obtaining or are about to obtain money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(b)  have engaged, are engaged, or are about to engage in transactions, acts, practices and courses of business that operated or would operate as a fraud upon purchasers of securities.

117.     By reason of the foregoing LPL has violated and are violating Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

<u>**TENTH CAUSE OF ACTION**</u>
**Violation of § 206(2) of the Advisors Act**
**(Against LPL)**

118.     The Shelleys hereby incorporate by reference the allegations contained in each of the foregoing paragraphs.

119.     LPL violated Section 206(2) of the Advisers Act by falsely stating in its Form ADV Part 2A that the firm and its employees "avoid any circumstances that might adversely affect, or appear to affect, our duty of loyalty" and that allocations of block trades would be "fair and equitable to all clients with no particular group or client being favored or disfavored over any other." The Form ADV also stated: "All of our advice is based on an assessment of each client's individual needs, which we identify at the onset of each relationship. . . . We review each client's individual investments and investment profile at least as frequently as annually." This

representation was misleading in light of the firm's inadequate oversight of trading and suitability, including its failure to determine TDA-custodied clients' investment objectives for at least six months.

120.   LPL was negligent in making these statements without disclosing that it had failed to implement its policies requiring pre-allocation of block trades, daily review of allocations, and oversight of client trading and the suitability of client investments such as Shelleys.

121.   By engaging in the conduct described above, LPL, directly or indirectly, by the use of the mails or any means of interstate commerce, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon any client or prospective client.

122.   By engaging in the conduct described above, LPL violated Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## PRAYER FOR RELIEF

Accordingly, the Shelleys pray for judgment against Defendants as follows:

**AS TO THE FIRST CAUSE OF ACTION**:

1.   For damages according to proof at trial in an amount no less than $1,364,700, plus interest and $1,507,500 lost investment;

2.   For costs of suit herein;

3.   For interest as allowed by law;

4.   Attorney's fees; and

5.   For such other and further relief  including consequential damages as the Court deems just and proper.

**AS TO THE SECOND CAUSE OF ACTION**:

1.      For damages according to proof at trial in an amount no less than $1,364,700, plus interest and $1,507,500 lost investment;

2.      For interest as allowed by law;

3.      For costs of suit herein;

4.      Attorney's fees; and

5.      For such other and further relief  and consequential damages as the Court deems just and proper.

**AS TO THE THIRD CAUSE OF ACTION**:

1.      For rescission of the Shelleys' investment in Cazut and its related enterprise;

2.      For return of its investment including interest as allowed by law;

3.      Attorney's fees; and

4.      For such other and further relief and consequential damages  as the Court deems just and proper.

**AS TO THE FOURTH CAUSE OF ACTION**:

1.      For damages according to proof at trial;

2.      For punitive damages;

3.      For costs of suit herein;

4.      For interest as allowed by law;

5.      Attorney's fees; and

5.      For such other and further relief  including consequential damages as the Court deems just and proper.

**AS TO THE FIFTH CAUSE OF ACTION**:

1.      For damages according to proof at trial;

2.      For punitive damages;

3.      For costs of suit herein;

4.      For interest as allowed by law; and

5.      For such other and further relief  including consequential damages as the Court

deems just and proper.

**AS TO THE SIXTH CAUSE OF ACTION**:

1.      For damages according to proof at trial;

2.      For punitive damages;

3.      For costs of suit herein;

4.      For interest as allowed by law; and

5.      For such other and further relief including consequential damages as the Court

deems just and proper.

**AS TO THE SEVENTH CAUSE OF ACTION**:

1.      For damages according to proof at trial;

2.      For punitive damages;

3.      For costs of suit herein;

4.      For interest as allowed by law; and

5.      For such other and further relief including consequential damages as the Court

deems just and proper.

**AS TO THE EIGTH CAUSE OF ACTION**:

1.      For damages according to proof at trial;

2.      For punitive damages;

3.      For costs of suit herein;

4.      For interest as allowed by law; and

5.      For such other and further relief including consequential damages as the Court deems just and proper.

**AS TO THE NINTH CAUSE OF ACTION**:

1.      For damages according to proof at trial;

2.      For punitive damages;

3.      For costs of suit herein;

4.      For interest as allowed by law; and

5.      For such other and further relief including consequential damages as the Court deems just and proper.

**AS TO THE TENTH CAUSE OF ACTION**:

1.      For damages according to proof at trial;

2.      For punitive damages;

3.      For costs of suit herein;

4.      For interest as allowed by law; and

5.      For such other and further relief including consequential damages as the Court deems just and proper.

**JURY TRIAL DEMANDED**

The Shelleys hereby demand a trial by jury on all issues so triable.

DATED this 6th day of February, 2024.

TYCKSEN & SHATTUCK, L.C.

*/s/ Chad C Shattuck*
Attorney for Plaintiffs

24