MOYES SELLERS & HENDRICKS
Keith L. Hendricks (UTSBN: 18268)
1850 North Central Avenue, Suite 1100
Phoenix, Arizona 85004
Telephone: (602) 604-2141
khendricks@law-msh.com

Kunzler Bean & Adamson, PC
Robert Jeremy Adamson (UTSBN: 251380)
50 W. Broadway, Suite 1000
Salt Lake City, Utah 84101
Telephone: (619) 365-9110
jadamson@kba.law

*Co-counsel for Moving Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STAN SHELLEY and ANDREA LEE SHELLEY, as individuals,<br><br>Plaintiffs,<br><br>v.<br><br>RANDY REDD, *et al.*,<br><br>Defendants. | **MOVING DEFENDANTS' MOTION TO STAY PENDING ARBITRATION**<br><br>**AND**<br><br>**ALTERNATIVE MOTION TO DISMISS**<br><br>Case No. 2:24-cv-000095<br>Judge Howard C. Nielson Jr. |

**RELIEF SOUGHT AND GROUNDS THEREFORE**

Pursuant to 9 U.S.C.A. § 3, (the Federal Arbitration Act ("**FAA**")), Defendants Randy Redd ("**Randy**"), MaryLynn Redd ("**MaryLynn**"), Dakota Redd ("**Dakota**"), Kevin Clark ("**Kevin**") (collectively, the "**Individual Defendants**"), and Cazut Properties, LLC ("**Cazut**"), Redd Works, LLC ("**Works**") Rojo 91, LLC ("**Rojo**") and Peart 583, LLC ("**Peart**") (collectively,

the "**Arizona LLCs**") (the Individual Defendants and the Arizona LLCs are the "**Moving Defendants**") hereby move to stay this matter pending arbitration. Alternatively, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), Moving Defendants move to dismiss all claims in the Amended Complaint (Dkt. 6, "**Am. Compl.**") filed by Plaintiffs Stan Shelley ("**Stan**") and Andrea Shelley ("**Andrea**") (collectively, "**Plaintiffs**").

This dispute concerns Plaintiffs' acquisition of a near majority membership interest in Cazut, and Cazut's purchase of raw land in Arizona. Plaintiffs allege that they were fraudulently induced into acquiring their interest. Plaintiffs assert wide-ranging claims against the Moving Defendants including claims under federal securities laws and a bevy of state or common law theories. All of the claims arise out of or relate to Cazut's Operating Agreement, which requires "[a]ll disputes and controversies arising out of or relating to this Agreement shall be determined and settled by arbitration in Maricopa County, Arizona" as well as all disputes between Members.[1] Accordingly, the Court should enforce the clause by staying this matter until arbitration is complete.

Alternatively, the Court should dismiss all claims. This Court lacks personal jurisdiction over the Moving Defendants. Furthermore, Plaintiffs have not asserted viable federal securities claims and the Court lacks diversity jurisdiction.

This Motion is supported by the Declaration of Kevin Clark (Exhibit 1 hereto) (the "**Kevin**

---

[1] A copy of the Cazut operating agreement (the "**Operating Agreement**") is attached as Exhibit A to the Kevin Decl. (Ex. 1, hereto). The Arbitration provision is in section 10.12 on pages 19-20. The Operating Agreement is referenced in and incorporated into the pleadings. *See* Dkt. 6 at ¶¶ 14, 30, 32, 112. Accordingly, the Court may consider it in connection with this Motion. *See Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013).

**Decl.**"); the Declaration of MaryLynn Nevitt Redd (Exhibit 2 hereto) (the "**MaryLynn Decl.**"), the Declaration of Randy Dakota Redd (Exhibit 3 hereto) (the "**Dakota Decl.**"), and the Declaration of Randy Dean Redd (Exhibit 4 hereto) (the "**Randy Decl.**"), and the record in this matter.

**MEMORANDUM OF POINTS AND AUTHORITIES**

The gravamen of the claim is that in July, 2023 based on conversations with Randy and one email from Kevin, Plaintiffs wired $1,507,500 ("Plaintiffs' Wire") to acquire a near majority membership interest in defendant Cazut, which then purchased real property in Arizona. *See* Am. Compl., at ¶¶ 16-31. These claims are subject to arbitration or should be dismissed.

## I.   THE COURT SHOULD STAY THIS MATTER PENDING ARBITRATION.

Section three of the FAA provides that if a "suit" is brought in federal court "upon any issue referable to arbitration," the court is to "stay" the case "until such arbitration has been had in accordance with the terms of the agreement ...." 9 U.S.C.A. § 3.  The Tenth Circuit has held that "where the parties agreed to arbitrate in a particular forum only a district court in that forum has authority to compel arbitration under [FAA] § 4."  *Ansari v. Qwest Communications Corp.*, 414 F.3d 1214, 1219–20 (10th Cir. 2005).  In *Ansari*, the Tenth Circuit affirmed a district court's order to stay proceedings pending a determination on whether arbitration should be compelled by the district court in the forum's jurisdiction. *Id.* at 1216.  That should also be done here.

"The Supreme Court has long recognized and enforced a liberal federal policy favoring arbitration agreements." *Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F. 3d 1288, 1290 (10th Cir. 2004) (quotations omitted).  Federal courts therefore enforce arbitration agreements, and any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.*

- 3 -

(quotations omitted).

In this case, Plaintiffs allege that the entire Operating Agreement was induced by fraud and attempt to avoid arbitration. *See, e.g.,* Am. Compl., at ¶ 112 ("Cazut is … deemed null and void regarding its operating agreement…. Hence … arbitration for disputes between the parties is not applicable and void AB INITIO as a matter law due to the fraud in the inducement…"). Significantly, however, the Supreme Court has distinguished between a claim that an arbitration provision was fraudulently induced and "a claim of fraud in the inducement of the entire contract." *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 402 (1967). "Where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." *Id.*

The scope of the arbitration provision in *Prima Paint* is less robust in scope than the provision in the Cazut Operating Agreement. In *Prima Paint,* the arbitration provision included "(a)ny controversy or claim arising out of or relating to this Agreement, or the breach thereof." *Id.* at 406. Here, the arbitration provision provides:

> All disputes and controversies arising out of or relating to this Agreement shall be determined and settled by arbitration in Maricopa County, Arizona. … Arbitration shall be the exclusive method of resolving disputes and other matters in question between the Members, unless the Members otherwise agree in writing."

(Operating Agreement, at § 10.12) The allegations against the Moving Defendants all arise out of or relate to their participation for or on behalf of Cazut, or the operation of a member of Cazut or relate to their status as members. *See* Am. Compl., at ¶ 13 (Individual Defendants "operated" the Arizona LLCs); ¶ 14 (Moving Defendants entered into agreements "in the subsequent form of a written operating agreement" with Plaintiff); ¶ 30 ("as required in the operating agreement"); ¶ 32

("the individuals who signed the operating agreement").  As such, the claims against the Moving

Defendants "arise out of or relat[e]" to the Operating Agreement or are a dispute between Cazut's

members.[2]  This is even broader in scope than the arbitration clause in *Prima Paint,* where the

Court ordered arbitration.  *Id.* at 406.  *See also Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17,

20–21 (2012) ("when parties commit to arbitrate contractual disputes, it is a mainstay of the

[FAA's] substantive law that attacks on the validity of the contract, as distinct from attacks on the

validity of the arbitration clause itself, are to be resolved 'by the arbitrator in the first instance, not

by a federal or state court."); *Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63, 69

(2019) (the arbitrator and not "a court decide[s] the arbitrability issue.").

In this case, where the only challenge is to the Operating Agreement in its entirety and not

to arbitration individually, all disputes are subject to arbitration and the Court should stay this

matter.

## II.  ALTERNATIVELY, THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM.

### A.  LEGAL STANDARD

The Court Lacks "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian*

*Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673 (1994).  The Court must "presume no

jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction." *Dutcher*

*v. Matheson*, 840 F.3d 1183, 1189 (10th Cir. 2016) (quotations omitted).  *See also, Woods v. Ross*

---

[2] Under Arizona law, a non-signatory may compel arbitration when the plaintiff relies on the contract, there is a close relationship between the parties, to do otherwise would eviscerate the arbitration agreement, or the alleged conduct is interdependent. *See Sun Valley Ranch 308 Ltd. P'ship  v. Robson*, 231 Ariz. 287, 297, ¶¶ 37-38 (2012).

*Dress for Less, Inc.*, 833 Fed. Appx. 754, 756 (10th Cir. 2021).  To survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. When considering a motion under Rule 12(b)(6), courts "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir. 2012).

### 1.    **Personal Jurisdiction**

Due process "constrains a State's authority to bind a nonresident defendant …." *Walden v. Fiore*, 571 U.S. 277, 283 (2014).  For a court to "exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "The plaintiff bears the burden of establishing personal jurisdiction over the defendant." *Behagen v. Amateur Basketball Ass'n of U.S.A.,* 744 F.2d 731, 733 (10th Cir. 1984). *See also, Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996); *Beck v. D'Amour*, 923 F. Supp. 196, 199 (D. Utah 1996) *quoting Kennedy v. Freeman,* 919 F.2d 126, 128 (10th Cir.1990).  "In order to survive a motion to dismiss for lack of jurisdiction, the plaintiff must make a *prima facie* showing that jurisdiction exists." *Am. Land Program, Inc. v. Bonaventura Uitgevers Maatschappij, N.V.*, 710 F.2d 1449, 1454 (10th Cir. 1983) (*citing* 4 C. Wright & A. Miller, Federal Practice and Procedure § 1068 at 250 (1969)).

"[O]n a motion to dismiss for lack of personal jurisdiction, the allegations of the complaint are taken as true to the extent they are not contradicted by affidavits." *Wyatt v. Kaplan*, 686 F.2d 276, 282 n. 13 (5th Cir.1982) (*citing Black v. Acme Markets, Inc*., 564 F.2d 681, 683 n. 3 (5th Cir.1977)). *See also Am Land Program,* at 1454. Where conclusory or unsworn allegations are contradicted by sworn affidavits, Plaintiff fails to meet its burden of establishing that jurisdiction exists. *Id.*

Each defendant's contacts with Utah must be evaluated individually. *MFS Series Tr. III ex rel. MFS Mun. High Income Fund v. Grainger*, 2004 UT 61, ¶ 11, 96 P.3d 927, 931 (2004). "[C]ontacts giving rise to jurisdiction over a corporation cannot automatically be attributed to its officers and directors." *Id.* Furthermore, "[m]ere allegation of conspiracy, without some sort of prima facie factual showing of a conspiracy, cannot be the basis of personal jurisdiction of co-conspirators outside the territorial limits of the court." *Baldridge v. McPike, Inc*., 466 F.2d 65, 68 (10th Cir.1972). *See also, Raser Techs., Inc. by & through Houston Phoenix Group, LLC v. Morgan Stanley & Co*., 2019 UT 44, ¶ 87, 449 P.3d 150, 170 (2019) (bare allegation of participation or cooperation by a defendant with a person within personal jurisdiction of court is not enough).

General jurisdiction permits courts to "exercise jurisdiction over the person ..." *XMission, L.C. v. Fluent, LLC*, 955 F.3d 833, 840 (10th Cir. 2020). For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924 (2011). Corporate entities are subject to general jurisdiction when their contacts are so "continuous and systematic" to render them "at home" in the forum. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014).

Specific jurisdiction "allows a court to exercise jurisdiction over an out-of-state defendant only for claims related to the defendant's contacts with the forum State." *XMission*, 955 F.3d at 840.  Specific jurisdiction is present "if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'" *Id.* (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). "Purposeful direction" requires that the defendant have "'deliberately ... engaged in significant activities within' the forum State or deliberately directed its activities at the forum State, so that it has 'manifestly availed [itself] of the privilege of conducting business there.'" *Id.* (citation omitted).  Courts also consider additional factors such as the burden of submitting to personal jurisdiction in a foreign state, the forum's interest in adjudicating the dispute, the plaintiffs' interest in obtaining convenient and effective relief, the judicial system's interest in efficiency, and any fundamental social policies implicated by the case. *Research Med., Inc. v. Canadian Cardiovascular Products, Ltd*., 917 F. Supp. 767, 772 (D. Utah 1996).

### 2.   **Diversity Jurisdiction.**

To establish diversity, Plaintiff must demonstrate that there is complete diversity between the citizenship of the Plaintiffs and the citizenship of the Defendants. *Woods,* 833 Fed. Apps. at 756.  "[T]he statutory formulation 'between ... citizens of different States' ... require[s] complete diversity between all plaintiffs and all defendants." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) (citations omitted).  The citizenship of a limited liability company is determined by the citizenship of its members. *Lompe v. Sunridge Partners*, LLC, 818 F.3d 1041, 1047 (10th Cir. 2016).  Plaintiff must establish the citizenship of each member. *See Dutcher* at 1183.  Citizenship must be traced through all layers of members. *Id.*

**B.** **PERSONAL JURISDICTION OVER MOVING DEFENDANTS**

1. **General Jurisdiction**

Plaintiffs apparently concede that they cannot show general jurisdiction for any of the Moving Defendants because there are no such allegations asserted. This is consistent with the facts established by sworn statements.

None of the Individual Defendants are domiciled in Utah. They all live in Arizona. Moreover, none of the Individual Defendants regularly transact business in Utah. Kevin Decl., Exh. 1 hereto, at ¶¶ 2-3, 17-18; MaryLynn Decl., Exh. 2 hereto, at ¶¶ 2-3, 10-11; Dakota Decl., Exh. 3 hereto, at ¶¶ 2-3, 10-11; Randy Decl., Exh. 4 hereto, at ¶¶ 2-3, 7-9.

With regard to the Arizona LLCs, none have contacts with Utah that even approach the "continuous and systematic" bar. The declarations establish that none of the Arizona LLCs (a) have offices in Utah, (b) own or lease property in Utah, (c) have Utah employees, (d) have Utah bank accounts, (e) or conduct marketing or advertising in Utah. *See* Kevin Decl. at ¶¶ 5-8, 20, 22; MaryLynn Decl. at ¶6-7; Dakota Decl. at ¶ 6-7; Randy Decl. at ¶ 5-6, 22. Accordingly, general jurisdiction does not exist.

2. **Specific Jurisdiction**

Through conclusory allegations, Plaintiffs *attempt* to allege that the Moving Defendants are subject to *specific* jurisdiction in Utah. (*See* Am. Compl. at ¶ 14.). But Plaintiffs' factual allegations fall well short. Moreover, the exercise of jurisdiction over any Moving Defendant would offend notions of fair play and substantial justice.

a.   **Minimum Contacts**

Plaintiffs' only allegations of Utah contacts are that Randy "solicited" Stan, who is a Utah resident (Am. Compl. at ¶¶ 16-31), and conclusory allegations that other of the Moving Defendants entered into an agreement with Plaintiffs "verbally and in the form of a subsequent written operating agreement."[3] Am. Compl. at ¶ 14.  On their face, these allegations do not approach the minimum contacts bar.  There are few non-conclusory[4]  allegations with regard to most of the Moving Defendants.  *See, e.g., id*., at ¶ 3 (MaryLynn is Randy's wife); ¶ 4 (Dakota is Randy's son); ¶ 13; (Individual Defendants operate the Arizona LLCs); ¶¶ 14 and 31 (Individual Defendants entered into Operating Agreement for Arizona LLCs which are members of Cazut); ¶ 24 (Randy wanted MaryLynn to be given the title of President of Cazut); ¶ 28 (MaryLynn was to be "assistant manager" of Cazut); ¶ 28-29, 31 (Kevin sent one email to Cazut's members with the Operating Agreement).  None of the above stated non-conclusory facts establish contacts with Utah.

As to Randy's alleged solicitations (which lack the required "who, what, where, when and how" facts) it is "well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts." *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995); *see also CHG Cos. v. Medina Memorial Hosp.*, 2017 WL 5712689, at *3 (D.

---

[3] Defendants dispute the existence of any verbal agreement, but at any rate, the only verbal agreement even mentioned in the Amended Complaint was between Randy and Stan. Am. Compl. at ¶¶ 16-31.  No other Defendant is alleged to have been involved in any conversation.  *See id.*

[4] There are a number of conclusory allegations made without any specific factual references to actual conduct or actions. *See, e.g.,* Am. Compl., at ¶ 13, fn 1 (unknown actions "to be determined in discovery"); ¶ 27 (conclusory allegations of "corroboration"); ¶ 64 (conclusory allegations of securities violations); ¶ 65 (conclusory allegations of aiding and abetting); ¶ 66 (conclusory allegations that false statements); ¶ 70 (conclusory allegation about solicitations); ¶ 71 (conclusory allegations about controlling persons of Cazut).

Utah Nov. 27, 2017) (holding that "several emails and telephone calls" were "not enough to create purposeful availment and establish minimum contacts") (not selected for publication); *Eagle Precast Co. v. McCarthy Building Cos.*, 2003 WL 27174190, at *1 (D. Utah May 8, 2003) ("several letters and at least thirty telephone calls" did not create jurisdiction) (not selected for publication).

Nor is it significant that the Moving Defendants ended up entering into an agreement with Plaintiffs, who happen to be residents of Utah.  The "plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285.  The minimum contacts analysis "looks to the defendant's contacts **with the forum State itself**, not the defendant's contacts **with persons who reside there**," and "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 285–86 (emphasis added).  For this reason, the Supreme Court has said that "clearly" a "contract with an out-of-state party *alone*" does not "automatically establish sufficient minimum contacts in the other party's home forum."  *Burger King*, 471 U.S. at 478 (emphasis original). *See also Young v. Feeney*, 2008 WL 919529, at *5 (D. Utah. Apr. 3, 2008) ("contracting with a forum resident does not, of itself, constitute purposeful availment.") (not selected for publication); *Hydraulics Int'l, Inc. v. Amalga Composites, Inc.*, 2020 WL 586867, at *6 (D. Utah Feb. 6, 2020) ("[M]erely entering into a contract with a forum resident is insufficient to give rise to personal jurisdiction ....") (citation omitted; not selected for publication).  To support minimum contacts, the "prior negotiations and contemplated future consequences, along with the terms of the contract, and the parties' actual course of dealing" must point to the forum State. *Burger King*, 471 U.S. at 479.

To apply these principles here, Plaintiffs must allege that it matters to the agreement that

Plaintiffs lived in Utah or that Defendants were taking advantage of Utah law.  But here, it is clear that the agreement at issue here had nothing at all to do with Utah.  In fact, the Operating Agreement expressly provides that it (1) was formed "[p]ursuant to the **Arizona** Limited Liability Company Act" (*see* Exhibit A Kevin Decl., at §1.1), (2) is "an **Arizona** limited liability company (*id.*), (3) is effective upon the filing of the Articles of Organization … with the **Arizona** Corporation Commission (*id.*), (4) has a "principal place of business …[in] Gilbert, **Arizona**" (*id.* at § 1.4), (5) was formed to invest in "that certain parcel of [**Arizona**] real property" (*id.* at § 1.5), (6) has an **Arizona** "statutory agent" (*id.* at § 1.8), (7) includes indemnity "to the fullest extent permitted by **Arizona** law" (*id.* at § 3.8), (8) requires the filing of Articles of Termination to be filed with the **Arizona** Corporation Commission to dissolve (*id.* at §§ 9.1, 9.2, 9.4), (9) the Operating Agreement "and its application and interpretation shall be governed exclusively by its terms and by the laws of the State of **Arizona** as applied without regard to conflict of law principles" (*id.* at § 10.3), and, (10) as noted above, all disputes to be resolved by binding arbitration in Maricopa County, **Arizona**. *Id.* at § 10.12. *See also* Kevin Decl., at ¶ 22.  Thus, the fact that Plaintiffs "happened to be [] resident[s] of Utah was of no consequence." *See Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1299 (10th Cir. 1999); *see also Miner v. Rubin & Fiorella, LLC*, 242 F. Supp. 2d 1043, 1048 (D. Utah 2003) (no jurisdiction where plaintiff's residence in forum State was "a mere fortuity").

When analyzing tort claims, the Tenth Circuit "look[s] to the harmful effects" of tortious conduct. *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1231 (10th Cir. 2020). But the Tenth Circuit has also explained that "a defendant's interaction with a plaintiff—even when allegedly tortious—is insufficient to establish personal jurisdiction." *Id.*; *see also Rockwood*

*Select Asset Fund XI (6)-1, LLC v. Devine, Millimet & Branch*, 750 F.3d 1178, 1180 (10th Cir. 2014) ("*Walden* teaches that personal jurisdiction cannot be based on interaction with a plaintiff known to bear a strong connection to the forum state ... Under *Walden*, [the plaintiff's] reliance on its own Utah connections is misguided."). Here, Plaintiffs do not allege – and cannot show – that Defendants' allegedly tortious conduct was directed at Utah or took advantage of Utah law. Hence, minimum contacts do not exist for any Moving Defendant on any theory.

Finally, the phone records and the actual emails and texts reflecting conversations between Randy and Stan reflect that it was Stan who first reached out to Randy and solicited Randy to participate in an investment. *See* Randy Decl., at ¶¶ 7, 10-20. Moreover, Stan called and texted from a phone number with a Lincoln Nebraska area code. *Id.* at ¶¶ 10, 16. Based solely on the phone calls from this Nebraska area code and the face of the emails and texts, there is no obvious connection with Utah. Furthermore, it was Stan that initiated the solicitations. As such, this case is comparable to *Beck v. D'Amour*, 923 F. Supp. 196 (D. Utah 1996), where the court denied personal jurisdiction, in part, because "in the early stages of the relationship, it appears plaintiff was actually the one to pursue defendant, proffering an initial proposal that defendant did not solicit." *Id.* at 201.

b.     **Traditional Notions of Fair Play and Substantial Justice**

The exercise of personal jurisdiction over the Moving Defendants is also inappropriate because it violates "traditional notions of fair play and substantial justice." *See Dudnikov*, 514 F.3d at 1070. For this, the Tenth Circuit considers five factors: "(1) the burden on the defendant, (2) the forum state's interest …, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest …, and (5) the shared interest of the several states in

furthering fundamental social policies." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1096 (10th Cir. 1998).  These factors weigh decidedly in favor of Moving Defendants.

     *First*, the Moving Defendants will face a significant burden litigating in Utah, where they do not live and have no operations. *See OMI*, 149 F.3d at 1096 (explaining that this factor is "of primary concern"); *Celtig, LLC v. Patey*, 347 F. Supp. 3d 976, 990 (D. Utah 2018) (burden on non-resident CEO unreasonable).  *See also,* Kevin Decl., at ¶¶ 19-21; MaryLynn Decl., at ¶¶ 12-13; Dakota Decl., at ¶¶ 12-13; Randy Decl., at ¶¶ 21-23.  That is particularly true given that the Moving Defendants specifically bargained for application of Arizona law, governmental regulation, and the right to arbitrate disputes in Arizona.  *See, e.g.*, *Shipp v. Int'l Auto Grp. of S. Fla, Inc.*, 2016 WL 3951079, at *5 (D. Utah July 20, 2016) (requiring Florida company to litigate in Utah "would be a burden on Defendant because Defendants specifically contracted for disputes to be heard in their forum state of Florida") (not selected for publication).  *See also* Kevin Decl., at ¶¶ 22-24; MaryLynn Decl., at ¶ 14; Dakota Decl., at ¶ 14; Randy Decl., at ¶ 24.

     *Second*, although Utah may have an interest in adjudicating disputes involving its residents, this interest is "lessened" in the presence of the Arizona regulatory agencies, and the Arizona choice-of-law clauses. *See Shipp*, 2016 WL 3951079, at *5 (factor "lessened" where contract did "not require a general application of Utah law" and the parties "explicitly contracted for any litigation or disputes to be resolved outside of Utah") (not selected for publication).

     *Third*, there is no allegation or evidence that Plaintiffs' "interest in receiving convenient and effective relief" will be threatened by litigation in Arizona.  Indeed, Plaintiffs signed the Operating Agreement providing for Arizona law and an Arizona forum.  This is not the sort of case where Plaintiffs' "chances of recovery will be greatly diminished" by litigating in Arizona,

or the burden of litigating in Arizona "may be so overwhelming as to practically foreclose pursuit of the lawsuit." *OMI*, 149 F.3d at 1097.

*Fourth*, the interstate judicial system's interest in obtaining the most efficient resolution of controversies heavily favors litigating in Arizona because that is where: (1) Cazut was formed and is regulated, (2) the applicable state regulatory agencies are located, (3) the real property is located and will be developed, (4) the parties agreed to resolve their disputes, and (5) most parties and witnesses are located.

*Fifth*, the shared interest of Utah and Arizona in advancing social policies weighs against jurisdiction in Utah.  Utah also has a strong interest in enforcing arbitration clauses,[5] and "[i]f the Court were to exercise jurisdiction over Defendants, it would essentially defeat the purpose of contracting and the contractual parameters set by parties," *Shipp*, 2016 WL 3951079, at *6. This would "be a hindrance, rather than a furtherance, of a substantive social policy." *Id.*

### 3. Nationwide Service Of Process

The Moving Defendants recognize that some federal statutes, such as the 1934 Securities Exchange Act (the "Exchange Act"), provide for nationwide service of process (*see* 15 U.S.C. § 78aa), and that Plaintiffs assert claims under the Exchange Act against four of the Individual Defendants. *See* Am. Compl. ¶¶ 62–73.  However, the nationwide service of process does not confer personal jurisdiction over the Individual Defendants for two reasons. *First*, as set forth in more detail below, Plaintiffs' federal securities claims are not well-pled and therefore cannot form the basis for personal jurisdiction.  *Second*, even when a federal statute authorizes nationwide

---

[5] *See, e.g.*, *Chandler v. Blue Cross Blue Shield of Utah*, 833 P.2d 356, 358 (Utah 1992) (noting Utah's "strong public policy in favor of arbitration").

service of process, a federal court's exercise of jurisdiction must still "comport[] with due process." *Peay*, 205 F.3d at 1211.  As such, jurisdiction under the Exchange Act must still "be fair and reasonable" and protect "individual litigants against the burdens of litigation in an unduly inconvenient forum." *Id.* (citation omitted). The Tenth Circuit has defined five factors weighing on this determination that are essentially similar to the personal jurisdiction factors. *See id.*  The *Peay* factors weigh against the exercise of personal jurisdiction here.

*First*, Plaintiffs have not identified any relevant contact between any Moving Defendant and Utah (except contacts *with Plaintiffs*).  *Second*, litigating in Utah will unfairly burden the Moving Defendants, particularly in light of their bargained-for right to apply Arizona law and an Arizona arbitration forum.  *Third*, judicial economy favors litigation in Arizona given the absence of diversity jurisdiction and attendant ancillary jurisdiction issues.  *Fourth*, the bulk of discovery is likely to proceed in Arizona, where the witnesses, real property and Moving Defendants are located.  And *fifth*, to the extent any regulated activity is present, it is located in Arizona.

## C.    THE FEDERAL SECURITIES CLAIMS FAIL AS A MATTER OF LAW

The alleged basis for federal question jurisdiction is the federal securities claims. *See* Am. Compl., at ¶¶ 62-73.  These claims fail as a matter of law and are not well-pled.

### 1.    Plaintiffs' Cazut Membership Interest Is Not a "Security"

Notably, Plaintiffs do not allege that their near majority interest in Cazut is a "security" for purposes of the Exchange Act, or that Plaintiffs intended to act as "passive" investors.  Indeed, the allegations in the Amended Complaint and the Plaintiffs' rights under Cazut's Operating Agreement belie any such conclusions.

The first step in analyzing whether viable a federal securities claim has been alleged is to

determine whether Plaintiffs' interest in Cazut is a "security."  *See SEC v. W.J. Howey Co*., 328 U.S. 293, 299 (1946). *See also, Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999) (LLC membership interests are not a security unless they meet the *Howey* test). Here, the relevant factor of the *Howey* test is whether profits Plaintiffs expected were "to come solely from the efforts of others." *Howey,* 328 U.S. at 301.  In other words, the key question is whether Plaintiffs expected their Cazut interest to be a passive investment in which they were not involved. *See, e.g., Nelson v. Stahl,* 173 F. Supp. 2d 153, 165 (S.D.N.Y. 2001) ("Because the LLC agreements grant their members direct authority over management of the entities, their structure precludes satisfaction of the third element of the Howey test…").

There are very good reasons for the passivity prong of the *Howey* test, as construing the term "investment contract" too broadly in the context of LLCs "would work a fundamental and unjustifiable expansion in the securities laws by bringing innumerable commercial ventures within their purview." *Robinson v. Glynn*, 349 F.3d 166, 171 (4th Cir. 2003).  As the Fourth Circuit has explained, business ventures often "find their genesis in the different contributions of diverse individuals," like some who provide "capital and business acumen" and others who contribute "technical expertise." *Id.*  Yet not every collaborative business is a security under federal law. Federal courts have repeatedly held that an agreement which is primarily "a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way" is not an investment contract. *SEC v. Aqua–Sonic Products Corp*., 687 F.2d 577, 582 (2d Cir.1982).

The Tenth Circuit has explained that when LLC members have "control," this precludes characterizing their membership interests as "investment contracts". *Avenue Capital Mgmt. II, L.P.*

*v. Schaden*, 843 F.3d 876, 882 (10th Cir. 2016) ("*Schaden*").  According to the Tenth Circuit, control may be exercised by the investor's "own efforts or by majority vote in group ventures"; either way, when an investor has control rights, he or she "is not dependent upon the managerial skills of others" and therefore does not own an investment contract. *Schaden,* 843 F.3d at 882 (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982).  Indeed, if an investment scheme gives rise to a "reasonable expectation ... of significant investor control, a reasonable purchaser could be expected to make his own investigation of the new business he planned to undertake and the protection of the [Exchange Act] would be unnecessary." *Aqua–Sonic Products Corp.*, 687 F.2d at 585  *See also Keith v. Black Diamond Advisors, Inc.,* 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999) (finding an LLC interest was not a security because "[i]t is clear from [plaintiff's] allegations that he intended to maintain some degree of control" over the LLC).

In this case, the Cazut Operating Agreement provides Plaintiffs with substantial rights in the management and operation of Cazut.  All member's consent, including Plaintiffs, was required to (1) add a member, (2) **incur any debt or guarantee any act**, (3) grant a security interest in any property or assets, or (4) allow any Member, agent, or employee of Cazut to bind the entity. Operating Agreement at §§ 3.4, 3.5.  A supermajority of Members (67%), which explicitly required Plaintiffs' participation,[6] was required to (1) enter into any joint venture or other arrangement with another entity, (2) **acquire, convey, sell, transfer, or dispose of any real property**, or (3) change Cazut's business purpose. *Id.* at § 3.6.  Members set the compensation for the Manager (*id.* at §

---

[6] The schedule of membership interest attached as Exhibit 1 (DE 1-1) asserts that Plaintiffs' ownership was 45%.  As such, without Plaintiffs' participation the supermajority threshold could not be reached on any issue.

3.1), and establish the number of Managers. *Id.* at § 3.3.  Members can remove a Manager. *Id.* at

§ 3.10.  All Members, including Plaintiffs, had **the right to obtain information**; approve the sale,

exchange, or other disposition of assets; vote on all matters reserved to Members; and to **inspect**

**and copy Cazut's books**. *Id.* at §§ 4.3, 4.4, 4.5, 4.7.  Annual meetings were required and **Plaintiffs**

**had the right to call a "Special Meeting"** for any purpose. *Id.* at §§ 5.1, 5.2.

The allegations in the Amended Complaint also belie any conclusion that this was a passive

investment.  Plaintiffs go into substantial details of so-called "Subsequent Meetings." Am. Compl.,

at ¶¶ 35-61.  Specifically, Plaintiffs called a meeting on November 3, 2023. *Id.* at ¶ 37.  Stan was

"tasked … to get quotes and processes necessary for changing the zoning, … which Stan

accomplished..." *Id.* at ¶ 39.  "Stan was tasked to review an issue regarding taxes and the acreage

of the parcels …" *Id.* at ¶ 40.  Plaintiffs questioned operations. *Id.* at ¶ 41.  Plaintiffs were promised

an accounting. *Id.* at ¶ 45.  Plaintiffs found 40 additional acres needed for the development. *Id.* at

¶ 46.  Plaintiffs disputed the allocation of ownership interests of other Members. *Id.* at ¶ 50.

Plaintiffs were provided with an accounting. *Id.* at ¶ 60.  In other words, Plaintiffs, with their near

majority ownership interest, had a substantial role in the operation of Cazut both under the

Operating Agreement and as a matter of fact based on the allegations in the Amended Complaint.

The Tenth Circuit has identified six considerations to evaluate the passivity prong of the

*Howey* test: "(1) the investors' 'access to information'; (2) the investors' 'contractual powers'; (3)

the investors' contribution of time and effort to the success of the enterprise"; (4) 'the adequacy of

financing'; (5) 'the nature of the business risks'; and (6) 'the level of speculation.'" *Foxfield Villa*

*Assocs., LLC v. Robben*, 967 F.3d 1082, 1091 (10th Cir. 2020) (quoting *Schaden*, 843 F.3d at 882).

These six factors form the so-called *Schaden* test.  In practice, however, the first trio of *Schaden*

test factors control, and the second trio are the "least relevant" and are used "only to corroborate" whether "particular LLC interests are or are not investment contracts." *Foxfield*, 967 F.3d at 1093.[7]

*First*, as set forth above, both as a matter of right under the Operating Agreement and based on the facts alleged in the Amended Complaint, Plaintiffs had access to information. *See, e.g.*, *Foxfield*, 967 F.3d at 1093 (right to inspect records "alone powerfully suggests" that an LLC member has "access to all necessary information" about the investment); *Schaden*, 843 F.3d at 883 (LLC interest not a security where "the LLC agreement expressly stated that [the plaintiff] could inspect, examine, and copy [the LLC's] books"); *see also Rossi v. Quarmley*, 604 Fed. Appx. 171, 174 (3d Cir. 2015); *Nelson v. Stahl*, 173 F. Supp. 2d 153, 166 (S.D.N.Y. 2001).

*Second*, Plaintiffs had substantial "contractual powers" to control Cazut. As set forth above, the Operating Agreement expressly required Plaintiffs' consent for seven critical areas. Perhaps the most significant are that Cazut could not borrow money, "acquire, convey, sell, transfer, or dispose of any real property" or change "business purpose" without Plaintiffs' participation and consent. As Cazut's sole asset and business purpose was to develop a single parcel of property, this gave Plaintiffs substantial control. Moreover, members set the compensation for the Manager, and fixed the number of Managers. A majority of members could also remove a Manager. Arizona law, which controls, even provides that in manager-managed LLCs members still have important management rights. A.R.S. § 29-3407(C). Here, Plaintiffs' level of contractual control easily exceeds what federal courts see as sufficient to bring LLC

---

[7] Federal courts regularly resolve the issue of whether LLC membership interests are securities at the pleading stage, usually because the facts are clear from the LLC's governing documents, state law, and the allegations of the complaint. *See, e.g.*, *Schaden*, 843 F.3d at 886 (affirming grant of motion to dismiss); *Rossi v. Quarmley*, 604 Fed. Appx. 171, 175 (3d Cir. 2015) (same).

investments outside the *Howey* definition of an investment contract. *See Rossi*, 604 Fed. Appx. at 174 (citation omitted) (member's right to "vote in proportion to his share" or "call special meetings with the agreement of one other member" take LLC membership interests "outside the intended scope" of the Exchange Act).

*Third*, Plaintiffs' Plaintiffs admits that they "contribut[ed] [] time and effort to the success of the enterprise." *See Schaden*, 843 F.3d at 882.  As noted above, the Amended Complaint goes out of its way to allege that Plaintiffs took Cazut's success into their own hands.  This "level of control is antithetical to the notion of member passivity required" to satisfy *Howey*'s third prong. *See Keith*, 48 F. Supp. 2d at 333.

*Finally*, the fourth, fifth, and sixth *Schaden* factors "corroborate" the fact that the Plaintiffs' near majority membership interest is not a security. *Foxfield*, 967 F.3d at 1093. These factors – the adequacy of financing, the business risks, and the level of speculation – all illustrate in this case that Plaintiffs are sophisticated investors who had dealt with Defendants before, were familiar with the structure of this investment, and knew of (and exercised) their rights under the Operating Agreement.

### 2.     Plaintiffs Have Not Pled an Adequate Federal Securities Fraud Claim.

To assert a viable federal securities fraud claim, Plaintiff must allege, as to each defendant, a material misrepresentation by the defendant, scienter, a connection between the misrepresentation and the purchase of the security, reliance in the decision to purchase, and economic loss caused by the false statement. *See Adams v. Kinder-Morgan*, 340 F.3d 1083, 1095 (10th Cir. 2003).  Plaintiffs must also comply with the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which requires the

complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." Under the PSLRA, the Tenth Circuit has held that Plaintiffs must plead falsity with particularity and "facts sufficient to raise a strong inference of scienter." *Adams v. Kinder-Morgan, Inc*., 340 F.3d 1083, 1092 (10th Cir. 2003). Here, however, there is no statement of the "who, what, when, where and how" related to alleged misrepresentations. *See. e.g., Jensen v. Am.'s Wholesale Lender*, 425 Fed. Appx. 761, 763 (10th Cir. 2011). Without such, "these are the type of 'unadorned, the-defendant-unlawfully-harmed-me accusation[s]' ... rejected by the Supreme Court." *Id.* at 763 (*quoting Iqbal*, 129 S.Ct. at 1949). *See also, Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("[I]n alleging fraud or mistake," Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged.").

Plaintiffs do not approach these formidable pleading hurdles. The only alleged representations are from Randy to Stan. *See* Am. Compl., at ¶¶ 16-31. There are no alleged misrepresentations to Andrea, who signed the Cazut Operating Agreement and became its member. And as to the other Moving Defendants, there are only vague and conclusory "omissions" claims. The Supreme Court recently and unanimously made clear that "[p]ure omissions are not actionable under Rule 10b-5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. ----, --- S. Ct. ----, 2024 WL 1588706, at *2 (Apr. 12, 2024). Accordingly, to state *any* sort of securities fraud claim against MaryLynn, Dakota, or Kevin, Plaintiffs must identify *some* statement that was false or misleading in light of omitted information. No such allegation is made. "[P]laintiff must plead 'a highly unreasonable omission, involving not merely simple … negligence, but an extreme departure from the standards of ordinary care, and which

presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citations omitted).

Here, there is no allegation that anything was said to Andrea, or that Kevin, MaryLynn or Dakota knew that Randy and Stan were negotiating or the substance of the negotiations. Specifically, there is no allegation that Kevin MaryLynn or Dakota knew anything about alleged representations as to the ability to flip the property or allegations of future value. Indeed, representations as to future conduct, such as the ability to flip a property or future valuations, are not actionable fraud claims. *Bennett v. Coors Brewing Co.,* 189 F.3d 1221, 1230 (10th Cir. 1999) ("As a general rule, actionable fraud cannot consist of unfulfilled predictions or erroneous conjectures as to future events."). There is also no allegation sufficient to find that Kevin, MaryLynn or Dakota had any duty of disclosure. The sole alleged nexus between Kevin, MaryLynn, Dakota and their respective Arizona LLCs was only established *after* Plaintiffs' Wire and the execution of the Operating Agreement. There is no basis to conclude that there was a duty before that time.

The allegations of scienter are completely inadequate. *See City of Philadelphia v. Fleming Companies, Inc*., 264 F.3d 1245, 1259 (10th Cir. 2001) (must plead "facts raising a 'strong inference' of intentional or reckless misconduct."). First, Plaintiffs only assert a conclusory scienter claim with regard to Randy and Kevin. *See* Am. Compl., at ¶ 66 ("Randy and Kevin acted with scienter…"). MaryLynn and Dakota are noticeably excluded from even this conclusory allegation. Moreover, this conclusory allegation as to Randy and Kevin is legally insufficient. "Scienter exists if the defendant knew the statement was misleading or knew of the existence of

facts which, if disclosed, would have shown it to be misleading." *Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017, 1037 n. 26 (4th Cir.1997); *see also Phillips v. LCI International, Inc.*, 190 F.3d 609, 620 (4th Cir.1999). "Mere negligence will not suffice." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003). As demonstrated above, Scienter must be pled with particularity.

There is also an economic loss and causation problem. Plaintiffs' Wire was used by Cazut to purchase real property, which is Cazut's sole asset. There is no allegation that the property was not worth the purchase price, or has diminished in value.

Finally, Plaintiffs alleged that "Randy, Kevin, MaryLynn and Dakota **acting as aiders, abettors,** and promoters disseminated or approved … false misleading statements and omissions…" Am. Compl., at ¶ 65 (emphasis added). Significantly, there is no private right of action under the Exchange Act for aiding and abetting. "The § 10(b) implied private right of action does not extend to aiders and abettors. The conduct of a secondary actor must satisfy each of the elements or preconditions for liability…" *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008).

In short, Plaintiffs have failed to plead adequate federal securities claims and they should be dismissed.

### D.   THE COURT LACKS DIVERSITY JURISDICTION

Without federal question jurisdiction, the only other basis for jurisdiction for this Court is diversity. However, complete diversity between the citizenship of the parties is lacking here because Plaintiffs have sued Cazut, which is a limited liability company in which they own a

membership interest. *See* Am. Compl., at ¶¶ 29[8], 31.  As demonstrated above, for diversity purposes Plaintiffs' membership interest in Cazut makes Cazut a Utah citizen.  Moreover, Plaintiff failed to plead the citizenship of any of the LLC defendants, and LPL may also have Utah citizens as members.

Here, Plaintiffs did not attempt to identify or allege the citizenship of any of the members of the five LLCs it named as defendants.  Instead, Plaintiffs' simply assert that each LLC is headquartered in Arizona or California. *See* Am. Compl., at ¶¶ 6-10.  On its face, this is legally insufficient and grounds alone for dismissal of the diversity jurisdiction claim. *See Dutcher* at 1183.  *See also,* 1189 *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004); *Tele Munchen Fernseh GMBH & Co. Produktionsgesellschaft v. All. Atlantis Int'l Distrib., LLC,* 2013 WL 6055328, at *4 (C.D. Cal. Nov. 15, 2013) (not selected for publication).  Moreover, upon information and belief, LPL may also have Utah members, which also makes it a Utah citizen.  In any event, the Utah citizenship of the Plaintiffs' membership interest in Cazut destroys complete diversity and deprives this Court of diversity jurisdiction.

## III.  THE COURT SHOULD DECLINE ANCILLARY JURISDICTION

Plaintiffs assert "ancillary" jurisdiction over their state law claims. Am. Compl., at ¶ 11. Clearly, the state law claims predominate this case.  The Supreme Court has held that "ancillary jurisdiction typically involves claims by a defending party haled into court against his will, or by another person whose rights might be irretrievably lost unless he could assert them in an ongoing action in a federal court." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 376, 98 S. Ct.

---

[8] Paragraph 29 of the Am. Compl. refers to Exhibit 1, but no Exhibit 1 to Am. Compl. was filed. However, Exhibit 1 to the Original Complaint, Dkt 1-1, lists Plaintiff Andrea Shelley as a member.

2396, 2404 (1978).  That is not the case here.  This Court should decline to exercise ancillary jurisdiction over Plaintiffs' state law claims.

## IV.   <u>CONCLUSION</u>

The Court should stay this proceeding pending arbitration in Arizona.  Alternatively, this Court should dismiss this matter for lack of jurisdiction and failure to state a claim.

Dated, this 29th day of April, 2024.

*MOYES SELLERS & HENDRICKS*

*s/ Keith L. Hendricks*
Keith L. Hendricks
*Co-counsel for Respondents*

*KUNZLER BEAN & ADAMSON, PC*

*s/ Robert Jeremy Adamson*
Robert Jeremy Adamson
*Co-counsel for Respondents*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2024, I caused a true and correct copy of the foregoing

document to be served via CM/ECF on the following:

Chad C Shattuck
B. Ray Zoll
Tycksen & Shattuck, L.C.
12401 South 450 East, Suite E-1
Draper, Utah 84020
chad@tyshlaw.com
rayzoll@hotmail.com
*Attorneys for Plaintiffs*

                                    */s/R. Jeremy Adamson*