MOYES SELLERS & HENDRICKS
Keith L. Hendricks (UTSBN: 18268)
1850 North Central Avenue, Suite 1100
Phoenix, Arizona 85004
Telephone: (602) 604-2141
khendricks@law-msh.com

Kunzler Bean & Adamson, PC
Robert Jeremy Adamson (UTSBN: 251380)
50 W. Broadway, Suite 1000
Salt Lake City, Utah 84101
jadamson@kba.law
Telephone: (619) 365-9110

*Co-counsel for Individual Defendants and
Arizona LLCs*

---

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STAN SHELLEY and ANDREA LEE SHELLEY, as individuals,<br><br>Plaintiffs,<br><br>v.<br><br>RANDY REDD, an individual, MARYLYNN N. REDD, an individual, DAKOTA REDD, an individual, KEVIN CLARK, an individual, LPL Financial, LLC, a California corporation, and Cazut Properties, LLC, an Arizona Limited Liability Company, Redd Works, LLC, and Arizona Limited Liability Company, Rojo 91, LLC, an Arizona Limited Liability Company, Peart 583, LLC, an Arizona Limited Liability Company,<br><br>Defendants. | **DECLARATION OF KEVIN CLARK**<br><br>**EXHIBIT 1 IN SUPPORT OF IN MOTION TO COMPEL ARBITRATION AND ALTERNATIVE MOTION TO DISMISS FOR LACK OF JURISDICTION**<br><br>Case No. 2:24-cv-000095<br>Judge Howard C. Nielson Jr. |

I, Kevin Clark, declare under penalty of perjury as follows:

1.      I am a defendant in the above captioned matter. I make this declaration based on my own personal knowledge. I am over the age of 18 and I am competent to testify regarding the contents of this Declaration.

2.      I am not domiciled in Utah. I am a resident of Arizona. I live and work in Arizona. I do not regularly transact business in Utah. I own no property in Utah, nor do I lease any property in Utah. I have no bank account in Utah.

3.      I have not, to my knowledge, taken advantage of any Utah laws, or otherwise engaged in business or other conduct from which I could have reasonably been expected to be haled into court in Utah.

4.      I am a member and manager of Cazut Properties, LLC ("Cazut").

5.      I am also a member and manager of Defendant Peart 583, LLC ("Peart"). Peart is an Arizona limited liability company. There are other members of Peart who are not parties to this litigation. To my knowledge, all members of Peart are Arizona citizens.

6.      Peart has no contacts with Utah. This means, among other things, that Peart: (a) has no offices in Utah, (b) neither owns nor leases property in Utah, (c) has no Utah employees, (d) has no Utah bank accounts, (e) does not conduct marketing or advertising in Utah, and (f) has not conducted business in Utah.

7.      Effective July 13, 2023 and after I executed the Cazut operating agreement on Peart's behalf, Peart became a member of Cazut. Other than its membership in Cazut, Peart has not actively participated in the acquisition of Cazut's assets, nor has it made any representations to any other party, including Plaintiffs, regarding Cazut's assets or the acquisition of an interest in Cazut.

8.      Cazut is an Arizona limited liability company. At the present time, the members of Cazut include myself, Redd Works, LLC, an Arizona limited liability company; Rojo 91, LLC, an Arizona limited liability company; Peart; and the Andrea and

Stan Shelley, LLC, a Wyoming limited liability company (the Andrea and Stan Shelley LLC").

9.      Plaintiffs informed me that they are the only members of the Andrea and Stan Shelley LLC and that they reside in Utah.

10.      Attached as Exhibit A is a true and correct copy of the operating agreement for Cazut I sent to the members of Cazut and which was executed by each of the members of Cazut effective July 13, 2023 (the "Operating Agreement"). It is my understanding that Exhibit A hereto is the Operating Agreement referenced in Plaintiffs' complaint.

11.      Attached as Exhibit B is a true and correct copy of the email I sent to members of Cazut on July 14, 2023. It is my understanding that this is the email referenced in Plaintiffs' complaint.

12.      Andrea Shelley executed the Operating Agreement and was initially reflected as the member of Cazut. Andrea Shelley's interest was subsequently transferred, at Plaintiffs' direction, to the Andrea and Stan Shelley LLC.

13.      Andrea Shelley initially and now Plaintiffs through the Andrea and Stan Shelley LLC have a 45% membership interest in Cazut.

14.      I never spoke with Andrea Shelley about her acquisition of an interest in Cazut.

15.      I was not a party to Randy Redd's conversation with Stan Shelley. I did not know of the terms they were discussing other than what is reflected in the Operating Agreement.

16.      Other than providing the Operating Agreement attached as Exhibit A and the email attached as Exhibit B and, prior to July 13, 2023 I did not substantively discuss with Plaintiffs the terms of the Plaintiffs' acquisition of a membership interest in Cazut.

17.      I do not have any Utah licenses.

18.     I do not advertise for or solicit Utah clients.

19.     It would be a significant inconvenience and a burden for me to litigate a case in Utah where I do not reside. It would be burdensome both in terms of time and resources. I have no property, operations, residence, or employees in Utah.

20.     The property that Cazut purchased (the "Property") is in Arizona. To my knowledge, all of the witnesses knowledgeable about the Property's acquisition, value and development are in Arizona. To my further knowledge, other than Plaintiffs, no person associated with the acquisition, value or development of the Property is in Utah.

21.     There are many third parties who would be necessary witnesses on issues related to the acquisition, value, and development of the Property and none of them are in Utah. Most, if not all of them are in Arizona.

22.     The Operating Agreement executed by Plaintiff Andrea Shelley expressly provides that it was formed "[p]ursuant to the Arizona Limited Liability Company Act" (*see* Exhibit A, at §1.1), is "an Arizona limited liability company (*id.*), effective upon the filing of the Articles of Organization … with the Arizona Corporation Commission (*id.*), with a "principal place of business…[at] 3317 S. Highley Road, Suite 114 PMB 408, Gilbert, Arizona, 85297 (*id.* at § 1.4), formed to invest in "that certain parcel of [Arizona] real property (*id.* at § 1.5), with an Arizona "statutory agent for service of process (*id.* at § 1.8), with indemnity for the Manager "to the fullest extent permitted by Arizona law" (*id.* at § 3.8), requires the filing of Articles of Termination to be filed with the Arizona Corporation Commission to dissolve (*id.* at §§ 9.1, 9.2, 9.4), that the Operating Agreement "and its application and interpretation shall be governed exclusively by its terms and by the laws of the State of Arizona as applied without regard to conflict of law principles"(*id.* at § 10.3), and, as noted above, all disputes to be resolved by binding arbitration in Maricopa County, Arizona. *Id.*at § 10.12.

23.    Under the Operating Agreement, Plaintiffs had substantial authority because they had a near marority interest in Cazut.  Specifically, under the Operating Agreement all Members of Cazut were granted substantial rights in the management and operation of Cazut.  Plaintiffs' consent was specifically required to (1) add a member, (2) incur any debt or guarantee any act, (3) grant a security interest in any property or assets, or (4) take any other actions including allowing any Member, agent, or employee of Cazut to bind the entity. Operating Agreement, at §§ 3.4, 3.5.  A supermajority of Members (67%), which necessarily required Plaintiffs' participation as they had a 45% interest, was required to (1) enter into any joint venture or other arrangement with another entity, (2) acquire, convey, sell, transfer, or dispose of any real property, or (3) change Cazut's business purpose. *Id.* at § 3.6.  Members set the compensation for the Manager (*id.* at § 3.1), and establish the number of Managers. *Id.* at § 3.3.  Members can remove a Manager. *Id.* at § 3.10.  All Members, including Plaintiffs, had the right to obtain information; approve the sale, exchange, or other disposition of assets; vote on all matters reserved to Members; and to inspect and copy Cazut's books. *Id.* at §§ 4.3, 4.4, 4.5, 4.7.  Annual meetings were required and Plaintiffs had the right to call a "Special Meeting" for any purpose. *Id.* at §§ 5.1, 5.2.

24.    In agreeing to be a manager and member of Cazut, I relied on the Operating Agreement which provides for the application of Arizona law, Arizona governmental regulation, and the right to arbitrate disputes in Arizona.  These were important considerations for me.

I declare under penalty of perjury that the foregoing is true and correct.

Signed, this __ of April, 2024

Kevin Clark

# OPERATING AGREEMENT

# OF

# Cazut Properties, LLC

**Dated December 17, 2009**

**TABLE OF CONTENTS**

ARTICLE 1 FORMATION, NAME, PURPOSES, DEFINITIONS ................................................... 3
ARTICLE 2 CAPITALIZATION OF THE COMPANY .................................................. 6
ARTICLE 3 RIGHTS AND DUTIES OF MANAGER ................................................ 6
ARTICLE 4 RIGHTS AND OBLIGATIONS OF MEMBERS ........................................... 9
ARTICLE 5 MEETINGS OF MEMBERS .................................................................10
ARTICLE 6 INCOME, LOSSES AND DISTRIBUTIONS ...........................................12
ARTICLE 7 RESTRICTIONS ON WITHDRAWAL AND TRANSFERABILITY OF MEMBERSHIP INTERESTS ..........................................................................................................14
ARTICLE 8 ADDITIONAL MEMBERS.................................................................16
ARTICLE 9 DISSOLUTION AND TERMINATION .................................................16
ARTICLE 10 MISCELLANEOUS PROVISIONS .......................................................18

## OPERATING AGREEMENT
## OF
## CAZUT PROPERTIES, LLC

THIS OPERATING AGREEMENT is entered into effective as of July 13, 2023, by and among the undersigned Managers and Members of CAZUT PROPERTIES, LLC.

## ARTICLE 1
## FORMATION, NAME, PURPOSES, DEFINITIONS

1.1     Formation.  Pursuant to the Arizona Limited Liability Company Act (the "Act"), the parties have formed an Arizona limited liability company effective upon the filing of the Articles of Organization of this Company with the Arizona Corporation Commission, which filing did occur on December 17, 2009.  The parties shall immediately, and from time to time hereafter, as may be required by law, execute all amendments of the Articles of Organization, and do all filing, recording and other acts as may be appropriate to comply with the operation of the Company under the Act.

1.2     Intent.  It is the intent of the Members that the Company shall always be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes. It also is the intent of the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the Federal Bankruptcy Code.  No Member shall take any action inconsistent with the express intent of the parties hereto.

1.3     Name.  The name of this Company shall be "CAZUT PROPERTIES, LLC."

1.4     Place of Business.  The principal place of business of the Company shall be 3317 S. Higley Road, Suite 114 PMB 408, Gilbert, Arizona 85297, or such other place as the Members shall determine in their discretion.

1.5     Purpose.  This Company has been formed to invest in that certain parcel of real property (hereinafter the "Property").  The Company's investment objective is to realize operating income and capital appreciation in the Property over a long-term period, and this Company may engage in any activities that are directly or indirectly related to the accomplishment of such purpose.

1.6     Term.  The Company commenced upon the filing of the Articles of Organization, which filing did occur on December 17, 2009, and shall continue in perpetuity until such time as it shall be terminated under the provisions of Article 9 hereof.

1.7     Members.  The names and addresses of each of the Members of this Company are delineated on Schedule A attached hereto.

1.8     Agent for Service of Process.  The name and business address of the statutory agent for service of process for the Company is Kevin Clark, 23808 S. 150th Street, Chandler, Arizona 85249, or such other person as shall be appointed from time to time.

1.9     Definitions.  Whenever used in this Agreement, the following terms shall have the following meaning(s):

(a)      "Act" shall mean the Arizona Limited Liability Company Act, as and if amended.

(b)      "Additional Member" shall mean any person who is admitted to the Company as an Additional Member pursuant to Article 7 of this Agreement.

(c)      "Agreement" shall mean this written Operating Agreement.  No other document or oral agreement among the Members shall be treated as part of or superseding this Agreement unless it is reduced to writing and it has been signed by all of the Members.

(d)      "Capital Account" shall mean the account established and maintained for each Member which shall be:

(i)      increased by (1) the aggregate amount of Capital Contributions of cash to the Company made by such Member, (2) such Member's share of Income, (3) the fair market value of Capital Contributions of property net of liabilities secured by such property that the Company is considered to assume or take subject to Section 752 of the Code; and (4) the amount of any other upward adjustment to the Member's Capital Account required under Treasury Regulation Section 1.704-1(b); and

(ii)      decreased by (1) cash distributions to such Member from the Company (other than to any Member in repayment of any loan or advance), (2) such Member's share of Losses, (3) the fair market value of property distributed to the Member by the Company net of liabilities secured by such property that the Member is considered to assume or take subject to Section 752 of the Code; and (4) the amount of any other downward adjustment to the Member's Capital Account required under Treasury Regulation Section 1.704-1(b).

For purposes of computing the balance in a Member's Capital Account, no credit shall be given for any capital contribution which the Member is obligated to make until such contribution is actually made.  Any transferee of an Interest that is admitted as a Member shall succeed to the transferring Member's Capital Account in proportion to the credits and debits to such Capital Account related to the Interest transferred.  Notwithstanding any other provision in this Agreement to the contrary, the Capital Accounts of the Members shall be maintained in accordance with Treasury Regulation Section 1.704-1(b) and any successor provision thereto.

(e)      "Capital Contribution" shall mean any contribution to the capital of the Company in cash, property or services by a Member as made pursuant to Section 2.1 of this Agreement.

(f)      "Code" shall mean the Internal Revenue Code of 1986, as amended.

(g)      "Company" shall mean CAZUT PROPERTIES, LLC.

(h)      "Distributable Cash" shall mean any cash of the Company (excluding any Capital Contribution) available after paying all ordinary and necessary operating and capital expenses of the Company, and current amortization of any debt of the Company, and after establishing Reserves to meet current or reasonably expected obligations of the Company

and other purposes and uses of the Company to the extent the Members with Voting Interests, by a Majority-in-Interest vote, determine that such Reserves are necessary or advisable; provided, however, that Distributable Cash shall not include any cash if the payment of such cash to the Members would be restricted or prohibited by any note, mortgage, deed of trust or other agreement to which the Company is a party or by which the Company is bound.

(i)     "Federal Bankruptcy Code" shall mean Title 11 of the United States Code.

(j)     "Fiscal Year" shall mean the Company's fiscal year which shall be the calendar year.

(k)     "Income" and "Losses" shall be determined as of December 31 or any other year end of each year of the Company, and shall mean the income and losses of the Company for federal income tax purposes as determined by the Manager on the advice of the accountant who prepares the Company's federal income tax returns. "Income" shall include income exempt from federal income taxation and "Losses" shall include expenditures described in Section 705(a)(2)(B) of the Code or treated as such under Treasury Regulation Section 1.704-1(b).

(l)     "Interest" shall mean a Member's interest in the Company.

(m)     "Majority-In-Interest" shall mean Members owning a simple majority of the Percentage Interests.

(n)     "Managers" shall mean the Managers of the Company selected pursuant to Section 3.1 of this Agreement.

(o)     "Member" shall mean each of the parties who executes this Agreement as a Member and each of the parties who may hereafter become Additional or Substituted Members. To the extent a Manager holds an Interest in the Company, it will have all the rights of a Member with respect to such Interests, and the term "Member" as used herein shall include a Manager to the extent it holds such Interest in the Company.

(p)     "Minimum Gain" shall have the meaning set forth in Treasury Regulation Section 1.704-2(d).

(q)     "Organization Expenses" shall mean those expenses incurred in connection with the formation of the Company.

(r)     "Percentage Interest" shall be the Members' respective percentage Interests in the Company and in the Company's distributions, Income and Losses as set forth in Schedule A hereto.

(s)     "Person" shall mean any individual and any legal entity, and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

(t)     "Property" shall refer to that certain parcel of real property.

(u)     "<u>Reserves</u>" means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Manager in their discretion for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

(v)     "<u>Super Majority-In-Interest</u>" shall mean Members owning sixty-seven percent (67%) of the Percentage Interests.

(w)     "<u>Treasury Regulations</u>" shall mean the Regulations issued by the Treasury under the Code.

(x)     "<u>Withdrawal Event</u>" shall mean those events and circumstances listed in A.R.S. Section 29-733.

## ARTICLE 2
## CAPITALIZATION OF THE COMPANY

2.1     <u>Capital Contributions</u>.   Each Member shall make Capital Contributions to the Company upon its formation.  In no event shall any Member be required to contribute more than said stated amounts.  Any Capital Contributions made by a Member in excess of that actually required shall be promptly refunded to such Members.  No further Capital Contributions shall be allowed or required except upon unanimous agreement of the Members.

2.2     <u>Loans to the Company</u>.  Any permitted loan to the Company or permitted advance of money for the benefit of the Company made by a Member shall not increase such Member's Capital Account, entitle such Member to any greater share of Company distributions, or subject such Member to any greater proportion of Company Income or Losses.  The amount of any such loan or advance shall be a debt owed by the Company to the lending Member, and controlled by the terms of the promissory note or bearing interest at a reasonable commercial rate, considering the amount, term and security for such loan or advance, and in no event at a rate less than the minimum rate to avoid additional interest being imputed under the Code.

2.3     <u>Amendment to Capital Account Provisions</u>.   In the event the Manager shall determine, after consultation with Company counsel, that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto are allocated or computed, in order to comply with Section 704(b) of the Code and the Treasury Regulations applicable thereto, the Manager shall make such modification without the consent of any other Member, provided the Manager determines reasonably and in good faith that such modification is not likely to have a material adverse effect on the amounts properly distributable to any Member upon the termination of this Company and that such modification will not increase the liability of any Member to third parties.

## ARTICLE 3
## RIGHTS AND DUTIES OF MANAGER

3.1     <u>Management</u>.  The Manager of the Company shall be KEVIN CLARK.  The business and affairs of the Company shall be managed by its designated Managers and, in consideration of such services; the Manager shall receive a fee ("Manager's Fee") in an amount

agreed to by a Majority-In-Interest of the Members.  Subject to the provisions of Section 3.5 below, the Manager shall direct, manage and control the business of the Company to the best of his ability and shall have full and complete authority, power and discretion to make any and all decisions and to do any and all things which the Manager shall deem to be reasonably required to accomplish the business and objectives of the Company.  Except as, and if, otherwise expressly provided to the contrary elsewhere in this Agreement, no individual Member other than a Manager, and only to the extent granted herein, shall have the authority to act for or bind the Company.

3.2     <u>Assistant Manager</u>.  The initial Assistant Manager shall be MARYLYNN REDD.  The Assistant Manager shall be subject to the same duties, obligations and limitations as the Manager under this Agreement, and the Assistant Manager shall be entitled to exercise all of the rights, authority and powers of the Manager under this Agreement, only if:  (a) the Manager expressly so provides in writing (and only to the extent provided for in such writing); or (b) during any period, the Manager is incapable of acting as a manager because of the Manager's absence or any physical or mental disability of the Member.

3.3     <u>Number, Tenure and Qualifications</u>.  The number of individuals constituting the Manager of the Company shall be fixed from time to time by the affirmative vote of a Majority-In-Interest of the Members, but in no instance shall there be less than one individual constituting the Manager and one individual constituting the Assistant Manager.  After the Manager and Assistant Manager have served for a period of four years, the Members, by the affirmative vote of the Majority-In-Interest, shall either re-elect the existing Manager and Assistant Manager or elect a qualified successor Manager and Assistant Manager to serve in their stead.  A Manager need not be a resident of the State of Arizona, but the Manager is required to be a Member of the Company.

3.4     <u>Certain Powers of Manager</u>.  Without limiting the generality of Section 3.1, but subject to the provisions of Sections 3.5 and 3.6 below, the Manager shall have power and authority, on behalf of the Company:

(a)     To operate the Company and otherwise conduct the day-to-day operations of the Company;

(b)     To engage consultants or management companies to assist in the operations related to the Property; and to work with co-investors in the management of the Property;

(c)     To enter into lease agreements with tenants for the lease of the Property for residential purposes;

(d)     To purchase liability and other insurance to protect the Company and the Company's property and business;

(e)     To hold and own the Company's real and/or personal properties in the name of the Company;

(f)     To invest any Company funds temporarily in time deposits, short-term governmental obligations, commercial paper or other investments;

(g)     Subject to Section 3.6(b) below, to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan so long

as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(h)    To execute instruments and documents on behalf of the Company;

(i)    To employ or otherwise engage on behalf of the Company such Persons as the Manager in its reasonable judgment deems advisable to conduct the business of the Company; provided the amounts paid for such employment or engagement shall not exceed amounts customarily charged in arms-length transactions for services actually performed;

(j)    To act as "tax matters partner" pursuant to Section 6221 of the Code;

(k)    To enter into agreements and contracts on behalf of the Company, with any other person or entity for any purpose authorized by this Agreement; and

(l)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business and which are authorized by this Agreement.

Unless authorized to do so by unanimous consent of all the Members or by this Agreement, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

3.5    <u>Actions Requiring Approval of All Members</u>.  Notwithstanding any of the foregoing provisions of this Article 3 to the contrary, a Manager shall not undertake any of the following acts ("Major Decisions") without the express unanimous approval of all Members:

(a)    Adding a Member (subject to the provisions of Sections 8.1 and 8.3 below);

(b)    Making loans or borrowing money on behalf of the Company or causing the Company to guarantee or act as surety with respect to the obligations of others;

(c)    To hypothecate, encumber and/or grant security interests in the assets of the Company;

(d)    Taking any other action which this Agreement specifically requires to be agreed upon by all of the Members.

3.6    <u>Actions Requiring Approval of a Super Majority-In-Interest</u>.  A Manager shall not undertake any of the following acts without the express approval of a Super Majority-In-Interest of the Members:

(a)    Entering into or acquiring, on behalf of the Company, partnerships, joint ventures, corporations, limited liability companies or similar entities or arrangements;

(b)    Acquiring, conveying, selling, transferring or otherwise disposing of any real property (including the Property) in the name of the Company;

(c)    Changing the Company's purpose as identified in Section 1.5 hereof; and

(d)      Taking any other action which this Agreement specifically requires to be agreed upon by a Super Majority-In-Interest of the Members.

3.7      <u>No Exclusive Duty</u>.  The Manager shall not be required to manage the Company as his sole and exclusive function and it, and any Member, may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or a Member or to the income or proceeds derived therefrom.

3.8      <u>Indemnity of the Manager</u>.  The Manager shall be indemnified by the Company to the fullest extent permitted by Arizona law so long as the Company is able to procure insurance covering such indemnification.

3.9      <u>Resignation</u>.  Any Manager of the Company may resign as the Manager of the Company at any time by giving at least two (2) months' prior written notice to the Members of the Company; provided, that if all Members agree at any time without the necessity of giving such prior written notice.  The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The Manager's resignation shall not affect such Manager's rights and liabilities as a Member.

3.10     <u>Removal</u>.  A Manager is automatically removed from office upon the occurrence of a Withdrawal Event.  A Manager may also be removed at any time, with or without cause, by the affirmative vote of a Majority-In-Interest of the Members.  A Manager's removal shall not affect such Manager's Interest as a Member.  Any dispute as to proper cause for removal of a Manager shall be resolved in accordance with Section 10.12.

3.11     <u>Vacancies</u>.  Any vacancy occurring for any reason in the office of the Manager of the Company may be filled by the affirmative vote of a Majority-In-Interest of Members.  A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and shall qualify or until his earlier death, resignation or removal.  A Manager chosen to fill a position resulting from an increase in the number of individuals constituting the Manager shall hold office for a term not to exceed two (2) years and until his successor shall be elected and shall qualify, or until his earlier death, resignation or removal.

3.12     <u>Disputes</u>.   Any disputes between the Members regarding the removal or appointment of the Manager shall be resolved in accordance with the arbitration provisions set forth in Section 10.12.

**ARTICLE 4**
**RIGHTS AND OBLIGATIONS OF MEMBERS**

4.1      <u>Limitation of Liability</u>.  Each Member's liability for the debts and obligations of the Company shall be limited as set forth in Section 29-651 of the Act and other applicable law.

    4.2    <u>No Agency Right or Power</u>.  No Member as a Member shall have the right or power to bind the Company in dealings with third parties, in statements about the Company or in any other manner not specifically allowed by this Agreement.

    4.3    <u>List of Members</u>.  Upon written request of any Member, the Manager shall provide a list showing the names, last known addresses and interests of all Members in the Company.

    4.4    <u>Approval of Sale of Assets</u>.  The Members shall have the right, by the affirmative vote of a Majority-In-Interest of the Members, to approve the sale, exchange or other disposition of the Company's assets (including the Property) which is to occur as part of a single transaction or plan.

    4.5    <u>Number of Votes That Members May Cast</u>.  Except as otherwise expressly provided in this Agreement, for all matters in which the Members are entitled to vote, each Member shall have one vote for each interest of membership the Member holds in the Company as set forth in <u>Schedule A</u> hereto.

    4.6    <u>Number of Votes Necessary to Decide Member Matters</u>.  Except as otherwise expressly provided in this Agreement, each matter requiring a vote of the Members shall be decided by the Majority-In-Interest.

    4.7    <u>Company Books</u>.  The Manager shall maintain and preserve at the Company's registered office, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents, including, without limitation, a copy of the Articles of Organization initially filed with the Arizona Corporation Commission, copies of this Agreement, together with any supplements, modifications or amendments hereto, any prior operating agreements no longer in effect, written agreements by a Member to make a capital contribution to the Company, copies of the Company's federal, state and local income tax returns and reports and copies of all financial statements.  Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the Member's expense.

    4.8    <u>Priority and Return of Capital</u>.  No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Income, Losses or distributions; provided that this Section shall not apply to loans (as distinguished from capital contributions) which a Member has made to the Company or other Member in support of the Company.  Any return of Capital to the Members shall be allocated in accordance with the proportional amount of Capital Contributions by the Members.

**ARTICLE 5**
**MEETINGS OF MEMBERS**

    5.1    <u>Annual Meeting</u>.  An annual meeting of the Members shall be held on September 5, 2023, or at such other time as shall be determined by the Manager, commencing with the year 2023, for the purpose of the transaction of such business as may come before the meeting.

    5.2    <u>Special Meetings</u>.  Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Member.

5.3     Place of Meetings.  The, Members may designate any place, either within or outside the state of Arizona, as the place of meeting for any meeting of the Members.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be held via teleconference or zoom at the Company's direction.

5.4     Notice of Meetings.  Except as provided in Section 5.5, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or person calling the meeting, to each Member entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the Member at his or her address as it appears on the books of the Company, with postage thereon prepaid.  If transmitted by way of facsimile, such notice shall be deemed to be delivered to the date of such facsimile transmission to the fax number, if any, for the respective Member which has been supplied by such Member to the Manager and identified as such Member's facsimile number.

5.5     Meeting of all Members.  If all of the Members shall meet at any time and place, either within or outside of the state of Arizona, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

5.6     Record Date.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

5.7     Quorum.  A Majority-In-Interest of the Members, represented in person or by proxy, shall constitute a quorum at any meeting of Members.  In the absence of a quorum at any such meeting, a majority of the Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.  However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at a meeting.

5.8     Manner of Acting.  If a quorum is present, the affirmative vote of a Majority-In-Interest of the Members shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization or by this Agreement.  A vote of the Majority-In-Interest shall not be sufficient to act with respect to a matter which, under the terms of this Agreement, requires unanimous consent of the Members, including but not limited to changing the terms of this Agreement.

5.9     Proxies.  At all meetings of Members a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.  Such proxy shall be filed with the Manager of the Company before or at the time of the meeting.  No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

5.10    Action by Members Without a Meeting.  Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote and delivered to the Manager of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.  The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

5.11    Waiver of Notice.  When any notice is required to be given to any Member, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

**ARTICLE 6**
**INCOME, LOSSES AND DISTRIBUTIONS**

6.1    Percentage Interests.  The Percentage Interests of the Members are as set forth on Schedule A hereto.

6.2    No Percentage Interest Over 50%.  Unless agreed to by the unanimous consent of all Members, no Member's Percentage Interest in the Company shall ever exceed fifty percent (50%).

6.3    Income and Losses.  Subject to Section 6.5, Income and Losses shall be allocated among the Members in accordance with their Percentage Interests.

6.4    Non-Liquidating Distributions.  Distributions of Distributable Cash other than upon liquidation of the Company shall be made to the Members at such times and in such amounts and proportions as the Manager shall determine in his good faith, reasonable judgment.  Such distributions shall be proportional to the Percentage Interests of the Members.  Such amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any distribution to the Members shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section 6.4.

6.5    Compliance with Allocation Requirements of the Code.

(a)    Allocations of book and tax items with respect to property contributed by any Member shall be made solely for federal income tax purposes as required by Section 704(c) of the Code and the applicable Treasury Regulations thereunder.

(b)    If there is a net decrease in Minimum Gain during any fiscal year of the Company, and if a Member would otherwise have a deficit in its Capital Account at the end of such year, the Member shall be specially allocated items of Income for such year (and, if necessary, subsequent years) in an amount and manner sufficient to eliminate such deficit as quickly as possible.  The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2.  This Section 6.5(b) is intended to comply with the minimum gain chargeback requirement in such Section of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     In the event a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-l(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit of such Member's Capital Account as quickly as possible, provided that an allocation pursuant to this Section 6.5(c) shall be made only if and to the extent that the Member would have a deficit in its Capital Account after all other allocations provided for in this Agreement have been tentatively made.

(d)     Any allocations of items of Income or Losses pursuant to Sections 6.5(a), (b) or (c) shall be in the order as provided in the Treasury Regulations promulgated under Code Section 704(b) and shall be taken into account in computing subsequent allocations of Income or Losses pursuant to Section 6.3 so that the net amounts of the allocations under this Section 6.5 shall, to the maximum extent possible, be equal to the net amounts that would have been allocated pursuant to Section 6.3 if there had been no allocations pursuant to Section 6.5(a), (b) or (c).

(e)     Notwithstanding anything to the contrary in this Agreement no Member shall be allocated any item of Losses under this Agreement if such allocation would not have economic effect under the Treasury Regulations promulgated under Code Section 704(b) or any successor thereto.  Any such item of Losses shall instead be allocated solely to the Member or Members which would result in the allocation having economic effect under Code Section 704(b).  Income otherwise allocable to the Members under this Agreement from any source, except for allocations required under Sections 6.5(a), (b) or (c), shall first be allocated to the Member or Members receiving such allocations of Losses to the extent and in the proportion that Losses from that source have been reallocated to the such Member or Members pursuant to this Section 6.5(e).

6.6     <u>Limitation Upon Distributions</u>.  No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their contributions.

6.7     <u>Accounting Method</u>.  The books and records of account of the Company shall be maintained in accordance with the cash method of accounting.

6.8     <u>Interest On and Return of Capital Contributions</u>.  No Member shall be entitled to interest on the Member's Capital Contribution or to the return of the Member's Capital Contribution, except as otherwise specifically provided for herein.

6.9     <u>Accounting Period</u>. The Company's accounting period shall be the calendar year.

6.10    <u>Records, Audits and Reports</u>.  At the expense of the Company, the Manager shall maintain records and accounts of all operations and expenditures of the Company.  At a minimum the Company shall keep at its principal place of business the following records:

(a)     A current list of the full name and last known business, residence or mailing address of each Member and Manager, both past and present;

(b)       A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)       Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(d)       Copies of the Company's currently effective written Operating Agreement and all amendments thereto, copies of any prior written operating agreement no longer in effect, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property or services, and copies of any financial statements of the Company for the three most recent years;

(e)       Minutes of every annual, special, and court-ordered meeting; and

(f)       Any written consents obtained from Members for actions taken by Members without a meeting.

6.11    Returns and Other Elections.  The Manager, subject to the review and approval of all Members, shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.  All elections permitted to be made by the Company under federal or state laws shall be made by the Manager in their reasonable discretion.  The foregoing notwithstanding, no election shall be made to exclude the Company from the provisions of Subchapter K of the Code.

**ARTICLE 7**
**RESTRICTIONS ON WITHDRAWAL AND TRANSFERABILITY OF**
**MEMBERSHIP INTERESTS**

7.1    Restrictions on Withdrawal of Members.  No Member shall have any right to resign or withdraw voluntarily from the Company or to voluntarily commit an act that constitutes a Withdrawal Event without the consent of the Super Majority-In-Interest of the Members; provided, however, the foregoing shall not prohibit a Member from assigning all or a portion of such Member's right to Distributable Cash so long as the assignee thereof does not acquire an Interest as a result of such assignment.  Any voluntary act of a Member that constitutes a withdrawal from this Company shall constitute a material breach of this Agreement, and this Company shall be entitled pursuant to Section 29-734 of the Act to collect damages for such breach.  Such damages shall offset any cash or other property otherwise distributable to such Member by this Company.  The admission of a transferee of an Interest as a Member shall not affect the dissolution of the Company.

7.2    Right of Members to Acquire Withdrawn Member's Interest.  The Members, by vote of the Super Majority-In-Interest, may require a withdrawn Member to promptly sell all or any part of the withdrawn Member's Interest in the Company to the Company or to the other Members for its fair value and upon other reasonable purchase terms.  If the Members cannot agree with the

withdrawn Member on the purchase price or on the other terms of this purchase, these matters shall be decided by arbitration under Section 10.12 below.  In deciding any such arbitration, the arbitrator shall consider all relevant factors, including the conduct of the withdrawn Member resulting in the withdrawal.

7.3    Restrictions on Transferring Membership Interests – Right of First Refusal.

(a)    No Member shall have the right or power to transfer, pledge, sell, gift, devise or otherwise dispose of a membership Interest in the Company, or any part thereof, and no transfer, pledge, sale, gift, devise or other disposition shall be valid and effective, unless and until the membership Interest proposed to be transferred is first offered for sale to the other Members ratably in accordance with their membership Interests for the price at which and under the terms on which such membership Interest is proposed to be sold as evidenced by a bona fide offer to purchase.  Such offer to the Members shall be made in writing, signed by the offering Member and sent by certified or registered mail, return receipt requested, to (i) the Company's Manager and (ii) the Company's secretary, if any, at the Company's principal place of business.  Such offer shall remain open for acceptance by the other Members of the Company for a period of sixty (60) days from the date of mailing such offer.

(b)    Immediately upon receipt of such offer, the Manager shall forward copies thereof by certified or registered mail, return receipt requested; to each Member of record along with notification of the date such offer was mailed to the Company.  On or before the thirty-fourth (34th) day following the date such offer was mailed to the Company, each Member who elects to accept a pro rata share of such offer, up to a specified percentage of such offer, shall so advise the Manager by certified or registered mail, return receipt requested, and deposit with the Manager anything necessary to effectuate such acceptance under the terms of the offer.  On the thirty-fifth (35th) day following the day such offer was mailed to the Company, or as soon thereafter as is possible, the Manager shall by certified or registered mail, return receipt requested, advise each Member as to the portion of the offer, in terms of Percentage Interest, which has not been accepted by the Members.  On or before the sixtieth (60th) day following the date the offer was mailed to the Company, any Member on a first-come-first served basis may accept any unaccepted portion of the offer by advising the selling Member by certified or registered mail, return receipt requested, of the amount so accepted and delivering to the selling Member anything necessary to effectuate such acceptance under the terms of the offer.

(c)    The Members' rights-of-first-refusal as described above shall only apply to the extent the Members decide to purchase all of the offering Member's membership Interest.  Therefore, if, and only if: (i) the procedures and time limits set forth in paragraphs 7.3(a) and 7.3(b) above have been exhausted, and (ii) the purchasing Members have refused to purchase all of the selling Member's Interest in the Company within the sixty-day period, then the offering Member shall have the option to revoke his offer to the Members and sell his membership Interest to non-Member Persons.

(d)    The foregoing right-of-first refusal provisions of this Section 7.3 shall be subject to the fifty-percent (50%) restriction specified in Section 6.2 of this Agreement.

7.4 <u>No Dilution of Membership Interests</u>.  In the interest of avoiding dilution of membership Interests, any Member who, after exhausting the right-of-first refusal provisions set forth above, desires to transfer his or her <u>entire</u> Membership Interest to a Person that is not already a Member, the transferring Member may not transfer his or her membership Interest to more than two (2) Persons.  Any Member who, after exhausting the right-of-first refusal provisions set forth above, desires to transfer only a <u>portion</u>, but not all, of his or her Membership Interest to a Person that is not already a Member, the transferring Member may not transfer such portion of his or her membership Interest to more than one (1) Person.

**ARTICLE 8**
**ADDITIONAL MEMBERS**

8.1 <u>Blank</u>.

8.2 <u>Subsequent Additional Members Selected By Unanimous Consent</u>.  Subject to Sections 8.1 and 8.3, after the formation of the Company, a Person may be added as a Member of the Company only upon the written, unanimous consent of the Members for such consideration as the Members by their written, unanimous vote shall determine.

8.3 <u>Transferees of an Interest of a Member Approved By Super Majority-In-Interest</u>. No transferee of an Interest of a Member shall become a Member of the Company without the written consent of the Super Majority-In-Interest of the Members, which consent shall not be unreasonably withheld by any Member.

8.4 <u>Allocations to New Members</u>.  No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company.  The Manager may, at the time an additional Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of Income, Losses or items thereof to an additional Member for that portion of the Company's tax year in which an additional Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.

**ARTICLE 9**
**DISSOLUTION AND TERMINATION**

9.1 <u>Dissolution</u>.

(a) The Company shall be dissolved upon the occurrence of any of the following events:

(i) by the unanimous written agreement of all Members;

(ii) upon the entry of a decree of dissolution under Section 29-785 of the Act;

(iii) upon the acquisition by one Person of all of the outstanding Interests; or

(iv)     upon any other Withdrawal Event, unless the business of the Company is continued by the specific consent of all the remaining Members given within ninety (90) days after such event and there are at least two (2) remaining Members.

(v)     as soon as possible following the occurrence of any Withdrawal Event, if the Company is not continued, a representative of the Company shall execute and file a "Notice of Winding Up" with the Arizona Corporation Commission.

9.2     <u>Effect of Filing of Dissolving Statement</u>.  Upon the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until Articles of Termination have been filed with the Arizona Corporation Commission or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

9.3     <u>Winding Up, Liquidation and Distribution of Assets</u>.

(a)     <u>Winding Up</u>.  Upon dissolution of the Company, the Manager shall wind up the affairs of the Company, liquidate the Company assets, and pay the debts, liabilities and claims against the Company.  The Company shall engage in no further business other than as may be necessary to wind up the business of the Company and to distribute Company assets.  The Manager shall establish any reserves which the Manager may deem reasonably necessary for the payment of any contingent or unforeseen obligation of the Company.

(b)     <u>Distributions Permitted</u>.  Distributions in liquidation may be made in cash or in kind, or partly in cash and partly in kind.  Distributions in kind shall be valued at fair market value as determined by the Manager and shall be subject to reasonable conditions and restrictions necessary or advisable in the discretion of the Manager in order to preserve the value of the property or other assets so distributed.

(c)     <u>Allocations of Income and Losses</u>.  Income and Losses of the business during the period of dissolution shall be divided among or borne by the Members in accordance with the provisions of Section 6.3 of this Agreement.  Any property distributed in kind in the liquidation shall be valued at fair market value by the Members and treated as though the property were sold for such value and the cash proceeds were distributed.  The difference between the value of property distributed in kind and its adjusted book basis for federal income tax purposes shall be credited or charged as Income or Losses to the Members in proportion to their respective shares of Income and Losses pursuant to Section 6.3 above.

(d)     <u>Final Distributions</u>.  The proceeds from the liquidation of Company assets shall be applied and distributed by the end of the Company fiscal year in which liquidation occurs (or, if later, within ninety (90) days after the date of such liquidation) according to the following order:

(i)     To creditors of the Company, including repayment of any indebtedness owing to the Members, in the order of priority as provided by law;

(ii)     Next, the Manager shall set up minimal reserves, which the Manager reasonably deems necessary for any contingent liabilities or obligations of the Company other than to the Members (which reserves when they become unnecessary shall be distributed in the remaining priorities set forth in this Section 9.3(d)).   If such reserves are established, the Company shall comply with the requirements of Treasury Regulation Section 1. 704- 1 (b) regarding revaluation of Company property, adjustments of the Capital Accounts of the Members and ultimate distributions of such reserves;

(iii)     Next, to the Members in proportion to and to the extent of the positive balances in the Capital Accounts of each of them after taking into account all allocations and distributions for the Company fiscal year during which such liquidation occurs through the date of such liquidation (other than adjustments due to distributions pursuant to this Section 9.3(d)(iii)); and

(iv)     Any remaining balance, to the Members in the same manner as distributions under Section 6.3 above.

9.4     <u>Articles of Termination</u>.  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, Articles of Termination shall be executed and filed with the Arizona Corporation Commission.

9.5     <u>Return of Contribution</u>.  Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash or other property contribution of one or more Members, such Member or Members shall have no recourse against the Manager or any other Member.

**ARTICLE 10**
**MISCELLANEOUS PROVISIONS**

10.1     <u>Notices</u>.  Any notice, demand or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

10.2     <u>Books of Account and Records</u>.  Proper and complete records and books of account shall be kept or shall be caused to be kept by the Manager in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be maintained as provided in Sections 4.7 and 6.10.  The books and records shall at all times be maintained at the principal executive office of the Company, or at such other location designated by the Manager, and shall be open to the reasonable inspection and

examination of the Members or their duly authorized representatives during reasonable business hours.

10.3    <u>Application of Arizona Law</u>.  This Agreement and its application and interpretation shall be governed exclusively by its terms and by the laws of the State of Arizona as applied without regard to conflict of law principles.

10.4    <u>Waiver of Action for Partition</u>.  Each Member irrevocably waives during the term of the Company any right that he may have to maintain any action for partition with respect to the property of the Company.

10.5    <u>Amendments</u>.  This Agreement may not be amended except by the unanimous written agreement of all of the Members.

10.6    <u>Exception of Additional Instruments</u>.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

10.7    <u>Construction</u>.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders and vice versa.

10.8    <u>Headings</u>.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

10.9    <u>Waivers</u>.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

10.10    <u>Rights and Remedies Cumulative</u>.   The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

10.11    <u>Severability</u>.  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

10.12    <u>Arbitration</u>.    All disputes and controversies arising out of or relating to this Agreement shall be determined and settled by arbitration in Maricopa County, Arizona, as hereinafter set forth.  Upon a determination by a Member hereto that a dispute with any other Member concerning any matter arising out of or relating to this Agreement cannot be readily resolved other than by arbitration, the Member may elect to submit the matter to arbitration by giving written notice thereof to all other Members.  Within ten (10) days after the giving of such notice, the Members shall unanimously agree upon an arbitrator.  If the arbitrator cannot be mutually agreed upon within such ten (10) day period, each Member shall have an additional ten (10)

days to select an arbitrator of his choice.  These arbitrators shall then have a further ten (10) day period in which to choose an additional arbitrator, who shall be the sole arbitrator of the dispute.  If either Member should fail to nominate an arbitrator during the second ten (10) day period set forth above, the arbitrator selected by the other Member shall be the sole arbitrator of the dispute, and if there be more than one such arbitrator, they shall choose an additional arbitrator as described above. If the arbitrators cannot agree on a final sole arbitrator within the time period above specified, they shall be relieved of their duties and the parties shall, within ten (10) days, select new arbitrators who shall, within ten (10) days, select a sole arbitrator.  If these arbitrators are unable to agree upon a sole arbitrator within such period, then upon request of any Member, a presiding judge of the Maricopa County Superior Court shall select the sole arbitrator.  The arbitration shall be held within twenty (20) days after appointment of the sole arbitrator, and a decision shall be rendered by the arbitrator within ten (10) days after consideration of the arbitration, or as soon thereafter as is reasonably practical. Judgment of the sole arbitrator shall be final and binding upon the parties to the arbitration.  The Members further agree that any award rendered by the arbitrator may be entered in any court of competent jurisdiction, and they expressly waive any right to appeal the arbitration decision.  To the extent not inconsistent with the foregoing, the arbitration shall be done in accordance with the then-existing applicable rules of the American Arbitration Association, which rules shall govern. Arbitration shall be the exclusive method of resolving disputes and other matters in question between the Members, unless the Members otherwise agree in writing.

10.13    <u>Heirs, Successors and Assigns</u>.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

10.14    <u>Creditors</u>.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

10.15    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**[Remainder of Page Intentionally Left Blank.]**

IN WITNESS WHEREOF, the Managers and the Members have executed this Agreement as of the date first written above.

MANAGER:                                                    MEMBERS:


_____                    _____
         Kevin Clark                                                   **Kevin Clark**


                                                                    _____
                                                                    **Andrea Lee Shelley**

                                                                    **Rojo 91 LLC**

ASSISTANT MANAGER:

                                                                    By: _____
_____                              Marylynn N. Redd, Member
         Marylynn N. Redd

                                                                    **Redd Works LLC**


                                                                    By: _____
                                                                           R. Dakota Redd, Member


                                                                    **Peart 583 LLC**


                                                                    By: _____
                                                                           Kevin W. Clark, Manager

IN WITNESS WHEREOF, the Managers and the Members have executed this Agreement as of the date first written above.

MANAGER:

_____
Kevin Clark

MEMBERS:

_____
**Kevin Clark**

_____
**Andrea Lee Shelley**

**Rojo 91 LLC**

By: _____
Marylynn N. Redd, Member

**Redd Works LLC**

By: _____
R. Dakota Redd, Member

ASSISTANT MANAGER:

_____
Marylynn N. Redd

**Peart 583 LLC**

By: _____
Kevin W. Clark, Manager

IN WITNESS WHEREOF, the Managers and the Members have executed this Agreement as of the date first written above.

MANAGER:

_____
Kevin Clark

MEMBERS:

_____
**Kevin Clark**

_____
**Andrea Lee Shelley**

**Rojo 91 LLC**

By: _____
Marylynn N. Redd, Member

ASSISTANT MANAGER:

_____
Marylynn N. Redd

**Redd Works LLC**

By: _____
R. Dakota Redd, Member

**Peart 583 LLC**

By: _____
Kevin W. Clark, Manager

-21-

IN WITNESS WHEREOF, the Managers and the Members have executed this Agreement as of the date first written above.

MANAGER:                                                MEMBERS:

_____                          _____
        Kevin Clark                                           **Kevin Clark**

                                                         _____
                                                         **Andrea Lee Shelley**

                                                         **Rojo 91 LLC**

ASSISTANT MANAGER:

By: _____
        Marylynn N. Redd                          By: _____
                                                              Marylynn N. Redd / Member

                                                         **Redd Works LLC**

                                                         By: _____
                                                                 R. Dakota Redd, Member

                                                         **Peart 583 LLC**

                                                         By: _____
                                                                 Kevin W. Clark, Manager

-21-

## Cazut Properties LLC

From:  Kevin W Clark (kwclark@ix.netcom.com)

To:    loneconeaz@aol.com; dakotaredd@gmail.com; stanshelley3@gmail.com; kwclark@ix.netcom.com

Date:  Friday, July 14, 2023 at 08:48 AM MST

All,

The investment proposal for a property in Wickenburg Arizona has been discussed with each of you and you have expressed interest in investing.  Accordingly, attached is the Operating Agreement for the company which will acquire the property and an investor summary schedule.  We hope to close on the property within a couple of weeks, so please review the attached, sign if in agreement, and forward your investment capital to the company using the wiring instructions on Schedule A.  Also please return a signed signature page to me for the official files.

Call if you have any questions.

Kevin

C Financial, LLC
23808 S. 150th Street
Chandler, AZ 85249
kwclark@ix.netcom.com
480-895-9602
480-895-9625 fax

*IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment).*
*CONFIDENTIALITY NOTICE: The information contained in this message was intended for the specified recipient and may contain confidential information that may not be utilized by unauthorized persons.  Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. Thank you.*

 Cazut Properties LLC Operating Agreement 2023.pdf
176.8kB

 Cazut OA Schedule A 2023.pdf
400kB